## MARTIN AND FLINN vs. THE STATE.

[INDICTMENT FOR ARSON.]

1. *Ownership of property burned must be alleged.*—A count in an indictment for arson, which does not charge the ownership of the property alleged to have been burned, is substantially defective on motion in arrest of judgment.

2. *Admissibility of evidence of previous attempt to procure burning.*—The fact that the defendant, some five or six months before the burning charged in the indictment, requested another person (witness) to burn the house, is admissible evidence against him.

3. *Admissibility of evidence showing defendant's connection with attempts to suppress testimony of witness for prosecution.*—Promises and threats made by a third person, after indictment found, to a witness for the prosecution who had been before the grand jury, to induce him to leave the State, to the effect that, if he would leave, defendant " would pay him $200 or $300, and would give him money to set up business in New Orleans, and, if he refused, would kill him, or get some one else to kill him," are not admissible evidence against the defendant, unless his connection with the person by whom they were made is otherwise shown ; but the facts that the witness, at the time appointed for his departure with the person (one E.) who made the representations, " passed by defendant's house, and saw defendant standing in his door,—that defendant waived his hand to him to pass on by, which he did for a short distance, and waited a short time there, when E. came out of the house, with defendant's horse and buggy, and he saw defendant give him

some $25 for him," and that E. then carried him away with the horse and buggy, are competent evidence to be weighed by the jury.

4. *Knowledge of insurance necessary to establish intent to charge insurer.*—To justify a conviction for arson, under a count charging the burning to have been done "with the intent to charge or injure the insurance company," the jury must be satisfied from the evidence that the defendant had knowledge of the insurance.

5. *Corroborating evidence must tend to show guilt.*—The testimony of a witness for the prosecution, who is shown to be unworthy of credit, is not sufficient to justify a conviction, with corroborating evidence; and such corroborating evidence, to avail anything, must be of a fact tending to show the guilt of one or both of the defendants.

6. *Verdict of guilty on single count.*—Where an indictment contains several counts, a verdict of "guilty as charged in the second count" is equivalent to an acquittal as to the other counts.

FROM the City Court of Mobile.
Tried before the Hon. ALEX. MCKINSTRY.

INDICTMENT FOR ARSON against Francis Martin and Michael Flinn, containing four counts. The first count charged, that the defendants "willfully set fire to, or burned, in the night, a dwelling-house, or house adjoining thereto, in which dwelling-house there was at the time a human being"; the second, that they "willfully burned certain property, to-wit, the bar, and shelves, and closets, and bar fixtures in a building called 'The Constitution,' together with the wines, brandies, liquors, and stores in said building, which said bar, closets, shelves, fixtures, wines, liquors and stores were at the time insured against fire by the 'Mobile Navigation and Mutual Insurance Company,' with intent to charge or injure said Mobile Navigation and Mutual Insurance Company"; the third, that "they willfully set fire to, or burned, a store-house called 'The Constitution,' the property of Lyman Gibbons, said house being at the time of the value of $1,000"; and the fourth, that they "willfully set fire to, or burned, in the night time, an inhabited dwelling-house, without any human being therein at the time." The defendants, before the trial commenced, moved for a severance; but the court refused to grant it. They then moved "that the solicitor be required to elect on which count or counts in the indictment he would proceed, and that he be not permitted to try on all together." These motions were severally overruled, and the defendants excepted.

Martin and Flinn v. The State.

"On motion of the solicitor," as appears from the bill of exceptions, "at the commencement of the trial, it was ordered that the witnesses on both sides be put under the rule requiring all the rest, when any one was examined, to be absent. It was then proved, that the coffee-house called 'The Constitution,' a place for the sale of liquors, cigars, &c., (the lower room, or ground story, extending from Front street, near the wharfs of the city, to Commerce street, of a building at the intersection of these streets with St. Louis street, in one of the most frequented parts of the city of Mobile,) was, on the 4th January, 1853, kept by Joseph Mavro & Co., who then took out a policy of insurance of the Mobile Navigation and Mutual Insurance Company, on the bar, fixtures, counters, shelves, and other furniture of said coffee-house, and on the stock of liquors or merchandise therein, to the amount of $2,500, for the space of one year; that said Mavro & Co., on the 28th March, 1853, sold out all their interest and stock in said coffee-house to one Marigoni, and, with the assent of the company, assigned to him said policy of insurance; that said Marigoni, on the 4th January, 1854, renewed said policy of insurance, for the space of another year, and on the 5th July, 1854, sold out his stock and interest in the coffee-house to the defendant Martin, and, with the assent of the company, assigned to him the policy thus renewed; that said Martin, on the 4th January, 1855, on being informed by an agent of the company, as is customary, that the policy was about to expire, renewed the same (which had thus been transferred to him) for another year, by paying the premium, $33 50.

"It was further proved, that the fire for which the indictment was preferred, was discovered in this coffee-house, about 9 o'clock at night, on Saturday, the 28th April, 1855, from ten to twenty minutes after defendant Flinn, who attended the bar therein in the service of Martin, had closed the house and left it; that Flinn had hastened the departure of the persons who were there, so that he could close the room, and that he had no cigars in the bar-room; that the fire was caused by combustibles of a highly inflammable nature—to-wit, light-wood, cotton, and phosphorus, which had been put in several places behind the bar (or counter), in the decanter closets, and under the stairway, which extended

from Front and Commerce streets respectively to the story above; that there was property on the premises, belonging to Martin, to the amount of about $500; that the liquors and other things found on Monday morning after the fire in the coffee-house, (which was thronged by people during the fire, and was afterwards taken possession of by the police,) were of much less value than the amount of the policy of insurance; that the coffee-house had two fronts, one on Front street, and the other on Commerce street, which, by means of the doors of which they were composed, were daily thrown entirely open for customers; and that there were two other doors in the end on St. Louis street, which were also sometimes (but not usually) thrown open, and were not shown to have been open recently. There was no proof, on either side, as to whether Martin had been that day at said coffee-house.

"It was proved, also, that there was published in the newspapers of Mobile, before and at the time of the fire, a reward of $1,200, to be paid by the insurance companies, for the discovery and conviction of any white person of the offence of arson in the city, from the date of the advertisement (April 6th, 1855) to the 1st November following. Capt. H. R. Johnston, a steamboat captain, a witness indroduced by the State, testified that he had arrived, with many other persons, on a steamboat which had just come down the river, at the wharf opposite said coffee-house, and within four hundred feet thereof, shortly before the fire was discovered; that when near the coffee-house, on his way out home, he was arrested by the cry of fire, and helped to break open the doors and extinguish it; that he found all the doors were securely fastened; that in passing Martin's house, between 9 and 10 o'clock, on his way homeward, he saw Martin, at his residence about a mile from said coffee-house, in his shirt-sleeves, putting the blinds up to his windows, and informed him and his wife of the fire, that it was extinguished, and that the house was full of people; and that he left Martin going after his horse, to go down to said coffee-house.

"The State then introduced as a witness one Carr, a watchman of the city, who testified that, having been the first to arrest Martin, he expected part of the aforesaid reward, if he was convicted. After some evidence about the fire, he tes-

Martin and Flinn v. The State.

tified that he saw Martin, about 10 o'clock, come riding to said coffee-house; that Martin, when he came up, said to him, 'What is this? Where is my clerk? I came down to see a steamboat' (or, it might have been, some person on a steamboat) 'and find my house broken open!' On cross-examination, this witness said, that Martin was a foreigner and spoke English badly, but not so badly but that he understood him; that Martin did not say that he had come down to see about the fire,—that a steamboat captain had come by his house and told him of it; and he stated, on further cross-examination, that George A. Cleaveland, a justice of the peace, was present at this conversation with Martin. One Calloway, another watchman, was then introduced by the State, who said that he also expected a part of the reward if the defendants were convicted, and testified that he, too, was present when Martin came riding up, about 9½ o'clock; that Martin's first words were, 'Good evening—What's the matter here?' that Martin was told, in answer, that his house had been a-fire; and that he said he 'had come down to see a steamboat captain,' and asked where his clerk was, &c. Witness said, on cross-examination, that Martin spoke English very badly, and with a rapid utterance,—that it was very hard to understand him; that he might have said, he 'had come down to see about the fire,—a steamboat captain had told him of it;' and that he thought he did say something about 'Capt. Johnson.' But, on re-examination in chief, witness said that he did not understand or recollect that Martin said he had been told about the fire and had come down to see about it.

"The State then introduced and examined Jose Cortez, and one Rivers, whose testimony is hereinafter again referred to. The evidence on the part of the State being through, the defendant Martin introduced the said George A. Cleaveland as a witness in regard to his conversation with Carr and Calloway; to which the solicitor objected, because said Cleaveland had not been put under the rule, but had been in the court-room, and might have heard the testimony of Carr and Calloway, or might have been informed what the testimony was. The defendants offered to prove by said Cleaveland, that he had not heard any of the testimony, but had come, after being summoned, to see if he could not be excused from

attending; but the court said that the witness had been in the court-room, and in the door of it, for some time before he was called, and sustained the objection; to which ruling the defendants excepted." The defendants then offered to introduce C. F. Moulton for the same purpose, but the court sustained an objection to him for the same reason, and defendants excepted. ·"Afterwards, in the argument before the jury, the solicitor told them that Martin's declarations to Carr and Calloway were such as Martin's counsel had proposed to show they were by Cleaveland and Moulton, and admitted that such was the language of Martin to the witnesses."

"The said Jose Cortez, a witness for the State, testified, against defendants' objection, that he had been in the service of Martin, who was a manufacturer of cigars, at his residence, to make cigars for him; that Martin asked him, on Monday, the 21st November, if he would not do him a favor; that, on being asked what it was, Martin said he wanted him to burn 'The Constitution,' as it was doing a dull business, and had been a bad season on him; that he had not made as much money as he expected, that he would make money by burning his stock, &c., and getting the insurance money; that witness refused to do it, and told him he had better get somebody else. All this evidence was objected to by defendants, as irrelevant, and the objection overruled by the court; to which ruling of the court defendants excepted.

"Said Cortez was then interrogated by the solicitor, as to the circumstances of his going away, or being taken away by one Estapa, out of the State, since the finding of the indictment. The defendants, by their counsel, objected to any such statement, as being irrelevant and otherwise incompetent or . illegal; when the solicitor stated, that he proposed to show by the witness that Martin was connected with it, and that Martin's object was to suppress or remove the testimony of Cortez. The court overruled the objection, and the defendants excepted to its ruling. The witness then stated, that a few days after the finding of the indictment, he having been called before the grand jury as a witness, one Estapa, another Spaniard, (witness and Martin both being Spaniards,) called at his house every night for a week, and persuaded him to go away and leave the State,—that if he would go away, Martin would

pay him $200 or $300, and that they would give him money
to set up the cigar business in New Orleans, and would give
his wife some money here, and that, if he did not go away,
Martin would kill him, or get somebody to do it. Witness
said that he considered his life in danger, and at last agreed
to go with him, and to start from Estapa's house; that he
went along the street by Martin's house, at the time appoint-
ed, and saw Martin standing in the door, who waived his hand
to him to pass on by, which he did a short distance, and
waited a short time there, when Estapa came out of Martin's
house, with Martin's horse and buggy, and he saw Martin give
Estapa some $25 for him; that he went off with Estapa, in
the buggy, as far as Estapa's house that evening at Spring
Hill, and the next morning to Pascagoula, where Estapa left
him; that he went from that place to New Orleans, where he
was found in a few days by David Walker, a policeman of
Mobile, who brought him back to Mobile, witness having
promised to come back with him if Walker would get him out
of the guard-house in New Orleans, where witness was con-
fined; and that being required by the court, at the instance
of the State, to give bail in the sum of $1,000 for his appear-
ance as a witness in this case, he was unable to do so, and
had been therefore up to this time confined in jail. To all the
foregoing testimony, his conversations with Estapa, and Es-
tapa's alleged representations to him, defendants objected;
but the court overruled their objections, and they excepted.

"Said Cortez stated, on cross-examination, that, during his
confinement in jail, his wife had been furnished with $5 per
week for her support; that he did not feel friendly towards
Martin, because Martin (he thought) had treated him badly,
and had tried to bribe him; that he lived with Martin till
about the 1st January, 1855; that Martin never turned him
off for drunkenness or misbehaviour; that he told his brother-
in-law, Gonzales, of Martin's offer to bribe him, before the
fire occurred; that he told others, some of whom he named,
immediately after the burning of the 'Constitution.' He de-
nied that he had threatened to have revenge of Martin, or
that he had tried to persuade Gonzales to swear that he had
heard Martin offer to bribe him to burn the 'Constitution';
and he said that he (witness) had been residing in Mobile six

or seven years. One Rivers was then introduced by the
State as a witness, and testified, that he lived near Cortez in
May last, and that he saw Estapa, almost every night for
about a week, at the house of Cortez, shortly before the latter
disappeared, and up to the time he went away.

" J. M. Gonzales was introduced as a witness on the part
of the defence, and said, that he was a brother-in-law of
Cortez, and had worked with Martin in making cigars; that
he and Cortez, on Christmas day, 1854, went down together
to the 'Constitution,' and asked Martin for several small
christmas-gifts for each; that Martin refused to give Cortez
anything; that Cortez got angry, and threatened to have
revenge, and said that, if he saw Martin hanging by the neck,
he would pull him by the feet; that after the fire in the 'Con-
stitution,' and after Cortez had been before the grand jury,
he came to witness, and told him, that he was his brother-in-
law, and that he wanted him (witness) to testify that he had
heard Martin offer him (Cortez) $200 to burn the 'Constitu-
tion,' which testimony witness refused to give, and told Cor-
tez he had better drop the matter; that Cortez said, he had
got in the business, and he intended to go through with it;
and that Cortez had never before told him of this alleged
attempt of Martin's to bribe him. He testified, also, that
Cortez ought not to be believed on oath. Another witness,
one Charles Rawles, proved that he was acquainted with Cor-
tez, and knew his general character for truth; that (this on
cross-examination) he had had his attention particularly
called to Cortez, by finding out that he and his wife were
boarding in the house of his (witness') slaves; that he had
inquired about him, of two or three persons, and had heard
several persons speak of him,—had himself known him for
two or three years, but had never heard his character for
veracity discussed; that he would not, from Cortez' general
character, believe him on oath, and that he had never heard
any body speak well of him.

" On the part of Martin it was proved, that he carried on a
cigar manufactory at his residence, and sold cigars by the
wholesale to dealers in town ; that this business had a good
deal of his attention, and was entirely separate from that of
the 'Constitution'; that on the day of the fire he had gone to

town, about 9 o'clock in the morning, in his buggy, and returned on foot about 12 o'clock,—his horse having run away on his road home, and broken the buggy; that he remained at home until after dinner, and then went away on foot, and came back before night with the marketings; that he was at home from that time, and during a part of the time a couple of acquaintances casually with him, until he was informed by Capt. Johnson of the fire at the ' Constitution,' at which time he and his wife were just preparing to go to bed, other persons in the house having just retired; and that he thereupon immediately got his horse, and went down into the city on horseback. It was proved, also, by a large number of the most respectable witnesses, that Martin was very industrious, had lived in Mobile for seven or eight years, had been punctual and honest in his dealings, and had the reputation of being a good and honest man; and all these witnesses said, that they had never heard anything bad of him, until this prosecution was begun. There was proof, also, that Flinn had become Martin's clerk after Martin's renewal of the policy of insurance on said 4th January, 1855; and there was no proof that the ' Constitution,' or the house of which it was a part, belonged to Lyman Gibbons, or to any other person, or that it was occupied by any person except Martin and Flinn. One witness testified, that there was a small mattress bed in the ' Constitution,' which might have been Flinn's place of sleeping, but he did not know certainly that he slept there.

" The defendant Flinn asked the court to charge the jury, that before they could convict him on the second count of the indictment, alleging an attempt to charge or injure the insurance company, they must be satisfied from the evidence that he was informed that there was an insurance on the property burned. This charge the court refused, and charged the jury, that they must be satisfied, before Flinn could be convicted, that the property was insured, and that he burned it with the intent to defraud the insurance company; and said Flinn excepted.

" The court then charged the jury, on the request of Martin's counsel made in writing, that if they believed from the evidence that the witness Cortez was unworthy of credit, they ought not to convict upon his evidence alone, without corrob-

orating proof; and Martin, by his counsel, requested the court in writing to charge the jury, further, that such corroborating proof ought to be of a fact tending to show the guilt of one or both of the defendants, and not of a circumstance which, if true, did not show that the defendants, or either of them, was guilty; which charge the court refused to give, and said Martin excepted."

The jury having returned a verdict finding both the defendants "guilty as charged in the second count of the indictment," the defendants moved in arrest of judgment, on account of the insufficiency of that count; but the court overruled the motion, and sentenced them to five years imprisonment in the penitentiary.

The errors now assigned embrace all the rulings of the court above stated.

A. R. MANNING, C. P. ROBINSON, and H. CHAMBERLAIN, for the appellants, made the following points :

1. The court ought to have required the solicitor to elect on which count or counts he would proceed.—2 Select Equity and Law Cases, by Parsons, 381.

2. The court ought to have allowed Cleaveland and Moulton to testify. They were not offered to prove facts, but to testify to a conversation of Martin's, in relation to which he could not have adduced testimony at all unless it was first brought before the jury by the State, and he could not know that it would be brought before them.

3. The court erred in admitting the testimony of Cortez in relation to Martin's alleged request to him, in November, 1854, to burn the coffee-house. This offer was made some six months before the fire took place, was not acted on, and was not connected by any proof with the time of the fire, or with the origin of it. Thoughts and intentions are not abiding, like the laws of nature : no presumption of continuance can be applied to them, after such a lapse of time; else might every unguarded expression, every burst of passion, every thought of evil, given over and repented of, be revived years afterwards to give character and criminality to a mere accident happening to coincide in manner and place with the former intentions. This evidence was plainly inadmissible

against Flinn, and the record nowhere shows that the error in admitting it was cured.—14 Ala. 688; 15 *ib*. 624; 12 *ib*. 824; 13 *ib*. 823; 2 Russell on Crimes, 772.

4. The testimony of Cortez in relation to Estapa's alleged attempts to suppress his evidence, the threats which Estapa said Martin made against him, &c., ought not to have been admitted. This was clearly illegal, unless connected with Martin by. other proof; and no such connection was shown. As to Flinn it was certainly erroneous.

5. The refusal of the first charge asked by defendants was erroneous. An intent to charge or injure the insurance company could not exist if Flinn had no knowledge of the insurance.

6. If Cortez was unworthy of credit, the jury ought to have been instructed not to convict upon his evidence, unless it was corroborated by other testimony tending to show guilt. Roscoe's Criminal Evidence, pp. 156-8.

7. The judgment ought to have been arrested, on motion, because the second count, on which alone the defendants were found guilty, did not allege the ownership of the goods burned, or that the brandies were insured.—Martha v. The State, 26 Ala. 72; Reg. v. Parker, 3 Ad. & El. (N. S.) 292; 7 Watts, 181; 2 Select Law and Equity Cases, by Parsons, 484-5; Starr v. The State, 25 Ala. 46; Clarissa v. The State, 11 *ib*. 57.

M. A. BALDWIN, Attorney General, *contra*.

STONE, J.—The second count of the indictment in this case is substantially defective, in not charging the ownership of the property alleged to have been burned.—Martha v. The State, 26 Ala. 72. On that count alone the defendants were found guilty, and the motion in arrest of judgment should have prevailed.—Case of Beckwith, 1 Stew. 318; 1 Arch. Crim. Pleadings, by Waterman, 115; *ib*. p. 178, 31.

In Johnson v. The State, Justice Parsons uses the following language, "Any indications (of guilt) arising from the conduct, demeanor, or expressions of the party, are legal evidence against him. The law can never limit the number or kind of such indications."—17 Ala. p. 624. With the rule thus

expressed, we are entirely satisfied. Under its operation, the court below rightly admitted, as evidence to be weighed by the jury, the testimony of Cortez, that some time before the burning, Martin requested him, the witness, to burn the ' Constitution.'  Also, the fact that, when Cortez was leaving Alabama, *after the indictment was found*, Estapa, coming out of Martin's house, Martin being present, had possession of Martin's horse and buggy, and with them carried Martin out of the State.  The waiving of Martin's hand to Cortez at that time, the payment of money by Martin to Estapa, if witness saw, and could testify to the facts, were admissible evidence; slight circumstances in themselves, but still admissible.

But the various conversations alleged to have been held between Cortez and Estapa, where wholly inadmissible. True, where a conspiracy between two or more to commit a crime, is established as an independent fact, then the acts, conduct and declarations of each are admissible evidence against all.  See Arch. Crim. Pleadings by Waterman, vol. 3, pp. 618-19, and notes.  But the acts and declarations of one man, made apart, can never be legal evidence against another of complicity with him, unless other proof than those acts or declarations show the community of purpose.—Stewart v. The State, 26 Ala. 44.

Rivers was introduced as a witness to sustain Cortez. The testimony he gave was not of a fact or circumstance tending to show the guilt of either of the defendants; and therefore it was inadmissible as a corroborating circumstance.

To justify the conviction of Flinn under the second count in the indictment, it was incumbent on the prosecution to satisfy the jury that he intended to " charge or injure the insurer," He could not entertain that intention, in the absence of knowledge that the property was insured.  It was then necessary that the jury should have been convinced by the proof that he had such knowledge.  The charge, as asked, ought to have been given; and the one given in lieu of it, not being equivalent to it, did not cure the error.  We do not hold that, to justify conviction, a witness must have sworn to the *direct fact*, that Flinn was *informed of the insurance.*  It was necessary, however, that facts or circumstances in evidence should have shown that he had such knowledge.

The first branch of the other charge, which was refused, is free from exception. Corroborating testimony, to avail any thing, must be of a fact tending to show the guilt of one or both of the parties.—Roscoe on Criminal Evidence, 157. But the latter branch of the charge is not correct in law. To hold that the corroborating circumstance is insufficient, unless it *shows* the guilt of the defendant, is not to corroborate the evidence, but to make out the case without it. This charge was properly refused.

The defendants having been found guilty "under the second count in the indictment," and the jury failing to respond to the other three counts, it follows that the prosecution as to the other three counts is at an end.—Coleman & Owen v. The State, 3 Ala. 14. The second count, we have seen, is insufficient.—Campbell v. The State, 9 Yerg. 333; Morris v. The State, 8 Smedes & Marshall, 762; The State v. Kelly, 2 Tyler, 471; Burns v. The State, 8 Ala. 313.

The judgment of the city court is reversed, and the cause remanded. Let the prisoners remain in custody until discharged by due course of law.