# BELL'S ADM'R vs. TROY.

[ACTION AGAINST MASTER TO RECOVER DAMAGES FOR ARSON BY SLAVE.]

1. *Difference between counts in trespass and in case.*—In an action against the master to recover damages for the burning of a dwelling-house by his slave, a count which charges the willful burning of the house by the slave, at the instigation and persuasion of the master, is in trespass; while a count which deduces the liability of the master from the fact that, knowing the bad character of the slave, he negligently permitted him to run at large contrary to law, if it has any legal validity, is in case.

2. *Misjoinder of counts.*—Counts in trespass should not be united with counts in

case ; yet the overruling of a demurrer to the entire complaint, on account of such misjoinder, will not work a reversal on error, where it appears very doubtful whether the counts in case show any legal liability on the part of the defendant, and a demurrer was sustained to every count but one : there being a reversal on other grounds, the defects in the pleadings can be remedied by amendment.

3. *Liability of master for misconduct of slave.*—Whether an action on the case lies against the master, to recover damages for the willful burning of a dwelling-house by his slave, because he negligently permitted the slave, who was of known bad character, to run at large contrary to law, " is exceedingly doubtful."

4. *Averment of criminal prosecution in civil action for damages.*—In a civil action against the master, to recover damages for the willful burning of a dwelling-house by his slave at his instigation and persuasion, an averment that " the defendant was duly and diligently prosecuted before the grand jury of said county," who inquired diligently into the charge of said burning, and found no true bill against the defendant, " under very technical rules, perhaps, is defective," if the count does not also allege that the defendant's act of instigation and persuasion took place in said county.

5. *Admissibility of advertisement as connected with conversation.*—An advertisement in a newspaper, which furnished the occasion of a conversation between one of the parties and a witness, but which formed no part of the conversation as detailed by the witness, and contained nothing tending to explain any admission made by the party during the conversation, is not admissible as evidence against him.

6. *Examination of witness.*—When the accuracy of a witness' memory, or of his statements, has been somewhat impeached on cross-examination, he may be asked, on re-examination by the party who introduced him, if his attention was not particularly directed at the time of their occurrence to the facts about which he testified, and why the circumstances detailed by him were impressed on his memory.

7. *Relevancy of evidence, in action against master for felony of slave.*—In an action against the master, to recover damages for the willful burning of a dwelling-house by his slave at his instigation and persuasion, a remark jestingly made by the defendant, when purchasing another slave several months before the burning, in these words, " Some folks object to these smart negroes, but I would rather have one of them' than three common field-hands. If I had one or two more like Lewis or Pleas, [the slave then bought, and the one charged with the burning,] they could steal me rich in a short time,"—is not admissible evidence against him.

8. *Same.*—The fact that an attempt was made, several weeks after the burning of plaintiff's house, to set fire to the house of his brother-in-law, considered as an independent fact, is not admissible evidence for the plaintiff in such action ; but, taken in connection with the fact that the burning of each house was under circumstances calculated to induce the suspicion that it was the work of an incendiary, and the further fact that the defendant was overheard to say to his slave, a few days after the second burning, " That's right, damn 'em, burn 'em up," is proper for the consideration of the jury, in determining to what the defendant's remark referred ; and the remark itself, in connection with this preliminary proof, is also admissible.

9. *Merger of civil action in felony.*—The rule is well settled in this court, that a

13

civil action cannot be maintained against a wrong-doer, to recover damages for an act which amounted to a felony, until a criminal prosecution against him has been instituted and terminated ; but this principle does not apply to a civil action against the master, for the felony of his slave.

10. *Explanatory charges.*—If a charge requested is free from involvement or tendency to mislead, and asserts a correct legal proposition, it is the duty of the court to give it as asked ; and if the presiding judge is apprehensive that it places any particular phase of the case in undue prominence before the jury, it is his privilege, if not his duty, to give an additional explanatory charge.

APPEAL from the Circuit Court of Dallas.

Tried before the Hon. NAT. COOK.

THIS action was brought by Matthew Troy, against John A. Bell, and, on the defendant's death pending the suit, was revived against his administrator.   The original complaint contained three counts, and three more were afterwards added by way of amendment, making the entire complaint as follows :

" The plaintiff claims of the defendant the sum of $20,000, as damages sustained by plaintiff by the burning of his dwelling-house, with the furniture therein, by a negro man slave, named Pleas, or Pleasant, the property of said defendant.   Said defendant unlawfully permitted said slave to go at large, and neglected or refused to exercise the dominion and control of him as required by law of a master, and such as the well-known bad character of said slave required; in consequence whereof, the said slave, being turned loose to the dominion of his own bad passions, did set fire to and burn the dwelling-house of said plaintiff, with the furniture and other effects of said plaintiff, of the value of $10,000 ; to plaintiff's damage as above stated.

" 2. And the further sum of $20,000, as damages for unlawfully and maliciously instigating and causing his slave Pleas, or Pleasant, in the county aforesaid, to set fire to and burn the dwelling-house of said plaintiff, with the furniture and other effects therein belonging to said plaintiff, of the value of $10,000 ; to the damage of the plaintiff as above stated.   Afterwards, to-wit, at the spring term, 1856, of the circuit court for said county, a prose-

cution was instituted against the said defendant, and witnesses went before the grand jury, and said grand jury did refuse to find a true bill against him for the burning of said dwelling house; by means whereof, this action accrues to said plaintiff.

"3. And the further sum of $20,000, as damages, for that said defendant wrongfully and unlawfully permitted and allowed his said slave, Pleasant, or Pleas, to go at large, and at the same time required said slave to pay him (defendant) wages; and the said slave, being unable or unwilling to work, and honestly to obtain the money or wages so required of him by said defendant, was thereby instigated and induced, as said defendant well knew, to steal and rob for the purpose of obtaining the money or wages so required of him by said defendant; and said slave, for the purpose of robbing and stealing as aforesaid, and being instigated and induced as aforesaid, did set fire to and burn plaintiff's dwelling-house, with the furniture and other effects of said plaintiff then therein; to plaintiff's damage as above stated.

"4. And plaintiff claims of defendant other $20,000 damages, for this: That the said defendant, on the — day of February, 1856, and before that time, was the owner, and had the right to control, a certain negro slave, named Pleasant, or Pleas; and plaintiff avers, that said slave was of bad and desperate character, which was well known to defendant; that on the — day of February, 1856, the said slave willfully set fire to and burned the dwelling-house of said plaintiff, in the town of Cahaba in said county, with a large quantity of furniture, of the value of $10,000; that said slave was instigated and persuaded to set fire to said dwelling-house by the said defendant; and that after said burning, to-wit, at the spring term of the circuit court of Dallas county aforesaid, the said defendant was duly and diligently prosecuted before the grand jury of said county, who inquired diligently into the charge of said burning, and found no bill against the said defendant, and thereupon said prosecution ended; by means whereof, plaintiff says he has been injured, and an action hath accrued to him to have and demand of

said defendant the said sum of $20,000 damages aforesaid.

"5. Plaintiff further claims of defendant $20,000 damages, for that the said defendant, before the commission of the grievances hereinafter alleged, was the owner of a certain negro slave, named Pleas, and had the right to control him, and, having such right, permitted said slave to go at large, and without the consent of the authorities of any corporate town; and while so going at large, to-wit, on the — day of February, 1856, the said slave set fire to the dwelling-house of plaintiff; and said dwelling-house, with a large quantity of furniture, of great value, to-wit, of the value of $10,000, was consumed. And plaintiff avers, that afterwards, to-wit, at the spring term of the circuit court of Dallas county, it being the county in which said burning was done, the said charge of burning said dwelling-house was duly prosecuted against said defendant, before the grand jury of said county, and the same was diligently inquired into, and said grand jury found no bill against the said defendant; by means whereof, plaintiff hath sustained damage, to the amount of $20,000 aforesaid.

"6. Plaintiff claims of defendant other $20,000, for that the said defendant, on the — day of February, 1856, was the owner of a certain slave, named Pleas, who was of bad and desperate character, and given to the commission of injuries, all of which was well known to the said defendant; and plaintiff avers, that on and before the said — day of February, 1856, the said defendant permitted said slave to go at large, without the consent of the authorities of any corporate town; that said slave, while so going at large, set fire to and burned the dwelling-house of plaintiff, with a large quantity of furniture, of the value of $10,000; that said slave has been duly prosecuted for said burning, by and upon an indictment found by the grand jury of said county of Dallas, at the spring term of said court, 1856, and tried; and that by reason of said wrongful permission of said slave to go at large, as aforesaid, and by said burning, he has been injured to the amount of $20,000; and hence this suit."

The defendant demurred to the entire complaint, and

to each count separately; assigning as grounds of demurrer to the complaint, 1st, that there was a misjoinder of counts in trespass with counts in case; and, 2d, that the averments as to time, place, and property, were uncertain, indefinite, and insufficient. The court overruled the demurrer to the entire complaint, but sustained the special demurrer to each count except the fourth; and the trial was had on issue joined on the plea of not guilty to that count.

" On the trial," as the bill of exceptions states, " the plaintiff introduced W. E. Bird as a witness, who testified, that he resided at Cahaba in said county; that on the night of the 10th February, 1856, he was awakened by the cry of ' fire,' and, on going to a window, saw that plaintiff's house was on fire at the south-east corner; that after taking a good look at the fire, he put on his clothes, and went over to plaintiff's house, which was about one hundred yards distant from his own; that the fire had reached the shingles on the corner when he arrived at the house, and the weather-boarding at that corner near the floor was consumed; that the night was very cold and windy, and the entire building was consumed in a short time; that the house was a large one, with twelve rooms in it, all under the same roof; that the room that was first on fire was a frame shell, without any plastering or ceiling, and was at that time used by plaintiff as a kitchen; that there was a stove in the room, used for cooking; that the stove-chimney was built of brick, from the joists, through and above the roof, and a pipe ran up from the stove into the bottom of the chimney at the joists; and that the family then residing in the house consisted of plaintiff, (who was then in Georgia,) his wife, and two children, with Mr. Cushman and Dr. Hunter. Witness stated the value of the house, and of the furniture destroyed, and further testified, that at the fire, when the house was nearly consumed, John A. Bell came up to him, and said, ' I am damned glad that Pleas is not here, so they can't charge it to him'; that at the time this remark was made, nothing had been said about Pleas, so far as he knew; that he could not remember what preceded or followed

that remark, or anything else said by Bell on that occasion; that two or three days after said burning, as he was going to his dinner, he met Pleas in the street; that he went to Kentucky a few days afterwards, and was absent four or five weeks; and that he was informed, on his return, that several attempts had been made to burn his house. On the defendant objecting to the witness stating what he had been informed, the court excluded said statement; and the witness then stated, that he knew. an attempt was made to burn his house in the month of May, 1856. The defendant also objected to this statement of witness, (which was admitted on plaintiff's undertaking to show that Bell was aware of the fact,) and moved the court to exclude the same from the jury, as irrelevant and inadmissible. The court overruled the objection, and the defendant excepted.

" Said witness further stated, that he was a brother-in-law of plaintiff, and intimate in his family; that at the time of the attempt to burn his house in May, 1856, the slave Pleas was confined in jail; that he had a conversation with Bell, a short time after his return from Kentucky, in which he said to Bell, ' Your boy Pleas burned Dr. Troy's house, and he is the same damned rascal that set fire to mine; you know, when Lodor owned him, and he was charged with robbing, Lodor was allowed to carry him off, and now you must carry him out of the State'; that Bell replied, ' The boy is a very valuable one, and pays me good wages regularly; but, if I can sell him for a fair price, I am willing to do so'; that he (witness) replied, that his wife and children were worth more than any property, and continued, 'I'll be God damned if that negro shall not leave here'; that Bell then said, ' Why, judge, Pleas could not have burned Dr. Troy's house; he was not here, but was down at Brown's near Woodville'; and that witness answered, ' Well, if I am satisfied that he was down there, I will say no more about it.' Witness further stated, that he immediately sent one Taylor down to Brown's house, to learn if Pleas had been there; that on Taylor's return, he went to a magistrate, obtained a warrant for the arrest of Pleas, placed it in the hands of

said Taylor as constable, and instructed him to keep the matter secret, but to use every exertion to arrest the said slave; that he put an advertisement in a newspaper, about a week after he obtained said warrant; that on the day the paper came out, John A. Bell and his father, John R. Bell, (the latter with a newspaper in his hand,) came into the office where witness was, and John R. Bell said, 'What is this about this advertisement about this boy?' to which witness answered, 'I put it in;' that John R. Bell then said, 'What will people think about this charge of harboring and secreting our slaves?' and asked witness to state in the same paper that he did not intend to make any charge against the Bells; to which witness answered, 'If I am satisfied that I have done you any wrong, when I get the boy I will repair it;' that John A. Bell then said, 'Didn't I tell you the boy was down at Brown's?' to which witness answered, 'Yes, you did tell me so; but I sent down to Brown's, and Pleas had not been there;' that John A. Bell then said, 'I'll get him;' and that John R. Bell said to him (witness) in the same conversation, 'You need not pay your money for catching the boy, we can get him for you.' Witness then produced a newspaper, and stated that it contained the advertisement to which said conversation referred; and plaintiff then offered to read said advertisement to the jury. The defendant objected, on the ground that said advertisement was illegal and irrelevant evidence; but the court overruled the objection, and permitted said advertisement to be read in evidence; to which the defendant excepted. Said advertisement is in the words and figures following:

"'ONE HUNDRED DOLLARS REWARD.

"'The reward of $500, offered for the detection of the individual that set fire to the premises of Dr. Troy, or the premises of Judge Bird, is withdrawn; and the sum of $100 is offered for the arrest of the negro man Pleas, the property of John A. Bell, who is now charged with the commission of said offenses, as well as the robberies perpetrated about the same time. He has been lurking about this place for some time, without employment, and is now supposed to be secreted in the vicinity. All per-

sons harboring or secreting him, or assisting in carrying him beyond the reach of justice, will be prosecuted under the 3219th section of the Alabama Code.' "

(Signed by M. Troy and W. E. Bird.)

" Said witness further testified, that about two weeks after he had sued out the warrant for the arrest of Pleas, he was standing at the court-house about nine o'clock at night, when he heard the voice of John A. Bell calling loudly to the jailor at the jail; that he went over to the jail, but, before he reached it, the slave Pleas was put in and locked up ; and that, fearing the slave might be taken out, as he was put in jail by Bell's consent, and without any legal authority, he went off to a justice of the peace, to get a *mittimus* for the confinement of the slave, The defendant objected to this last statement of the witness, unless the paper was produced, or was shown to be lost or destroyed ; but the court overruled the objection, and the defendant excepted. The witness then stated, that he applied to the justice, and obtained a *mittimus* for the confinement of the slave in jail. The defendant moved to exclude this statement of the witness from the jury, on the ground that the evidence was secondary, and that the paper was not produced, or its absence accounted for. The court overruled the objection, and the defendant excepted.

" Said witness further testified, that from the time Pleas was put in jail, until two or three o'clock in the night, he was sitting on a piazza of Troy & Boyd's office, near the jail; that during that time John A. Bell, sometimes alone, and sometimes with other persons unknown to witness, frequently walked towards the jail, but, on coming in sight of witness and those sitting with him, would turn back ; that Bell seemed excited during this time, and was talking, whistling, and singing. Also, that in April, 1856, Pleas was brought before a justice of the peace for preliminary examination, charged with seven felonies, among which was one for the burning of plaintiff's house ; that he (witness) represented the State on said examination, and was in fact prosecutor; that he introduced John A. Bell as a witness, and asked him, where

Pleas was on the night Dr. Troy's house was burned, and on the night witness' house was set on fire, and at the times when the robberies were committed; that Bell answered, that he was in Cahaba; that he then asked Bell, 'Did you not tell me, at the time Dr. Troy's house was burned, that Pleas was down at Brown's near Woodville?' to which Bell answered, 'If I did, I was not on oath then;' that he also asked Bell, how the slave had been employed for the last two or three months; and Bell replied, that he had worked two or three days at Dr. Saltmarsh's house, and two or three days for Mr. Millhouse, and had put a back in a chimney for his father, and that he had been sick a part of the time, and had only paid him five or six dollars. Said witness stated, on cross-examination, that he had been anxiously hunting for evidence to convict Pleas; that he was excitable, and would be more likely to remember facts which tended to prove the guilt of the slave, than any other facts in the case; but that he stated the full facts, so far as he knew them. On re-examination, said witness was asked by plaintiff's attorney, what was the particular matter about which he intended to examine Bell when he introduced him as a witness; the question being propounded in this form, as the plaintiff stated, to refresh the memory of the witness. The defendant objected to the question, and excepted to the overruling of his objection. The witness answered, that he intended to ask Bell particularly, where Pleas was when Dr. Troy's house was burned, and what work he had done. To the admission of this evidence the defendant objected; his objection was overruled, and he excepted. This witness also stated, that a prosecution was instituted against Bell, at the spring term of the circuit court of Dallas, 1856, for the burning of Dr. Troy's house, but the grand jury had ignored the bill; also, on cross-examination, that Dr. Troy's servants, whom he kept about his house, were careless, though not more so than slaves generally are; and that he had told plaintiff that the burning of his house was the result of systematic carelessness.

"James C. Taylor, a witness for plaintiff, testified that, in April, 1856, he went to Mr. Brown's near Woodville,

to look for the slave Pleas, but could not find him; that he received from W. E. Bird, after his return from Brown's, a warrant for the arrest of the slave, and was instructed by said Bird to keep it secret, but to use every exertion to arrest the slave; that he searched diligently for the slave about two weeks, and then arrested him, about nine o'clock at night, on the side-walk in the street at Duckworth's hotel, near a room occuped by John A. Bell; that he kept the matter of the warrant secret, as he had been instructed to do, and did not inform John A. Bell, or any of that family, that he had it. Said witness stated, that he once heard John A. Bell say, when buying a slave named Lewis, some months before the burning of plaintiff's house, 'Some folks object to these smart negroes, but I would rather have one of them than three common field-hands. If I had one or two more like Lewis or Pleas, they could steal me rich in a short time.' To the admission of this statement of the witness, as to the remark made by Bell, the defendant objected, because it was irrelevant and inadmissible as evidence in this suit; but the court overruled the objection, and the defendant excepted. The witness then stated, that the remark was playfully and jestingly made by said Bell.

" Mr. Miller was then examined as a witness by plaintiff, and testified, that on the night when Dr. Troy's house was burned, he was aroused from sleep by the ringing of the bells, and, as soon as he could dress, ran towards the fire; that he lived about a half-mile from Dr. Troy's house; that when about five hundred yards from the fire, he was looking up, and on looking down, discovered the slave Pleas, a few feet in advance of him, going towards the fire; that he did not know whether he met the slave, or overtook him; that Pleas went on before him, sometimes running, and sometimes walking fast; that they went on towards the fire in that way, some two hundred, or two hundred and fifty yards; that most of that distance was along the old railroad track, and across the old railroad bridge, in a south-western direction; that when about three hundred yards from the fire, at a point where the road forked, the slave, who was a few feet in advance of

him, took the right hand, and went in a western direction, while he (witness) took the left hand, and went directly south, towards the fire; that the last he saw of Pleas that night, the boy was thirty or forty yards from where he had turned off, near the school-house and Baptist church, still going on at about the same gait; that there was a rise of from four to six feet from where the slave turned off to the school-house, and Dr. Troy's house could be plainly seen from the school-house, but could not be seen from the point where the slave turned off, or at any other point where witness and the slave were together; that he could not see Dr. Troy's house until he had gone about eighty or one hundred yards from the point where the slave turned off; that he went on directly to the fire, and when he reached it, the main body of the building was on fire, and the kitchen was consumed, except the frame-work, which was falling.

Jesse Commelander, the jailor, a witness for plaintiff, testified, that on the night when plaintiff's house was burned, he was asleep in the jail, and was awakened by the cries of one of the prisoners; that he dressed as soon as he could, and ran towards the fire, which was about six hundred yards from the jail; that he went to the fire by the way most usually traveled from that part of the town; that he met Pleas, when about three hundred and fifty yards from the fire, on the foot-bridge which crosses the ravine, and asked him, whose house was burning; that Pleas replied, it was Dr. Troy's; that he (witness) went on to the fire, and when he reached it, the kitchen was consumed, the main building was on fire, and the fire was burning on the north wing. Also, that it was about one hundred and fifty yards north from the foot-bridge to the point where the witness Miller stated he last saw Pleas, and about the same distance west from the foot-bridge to the school-house by the most direct way; that it was necessary to cross the ravine in going from Duckworth's hotel to Dr. Troy's house; that the railroad bridge and the foot-bridge were the usual places of crossing, but the ravine could be crossed at from twelve to forty places, though in many places it could not be crossed; that he

did not see Pleas at the fire, and met no other person coming from the direction of the fire; and that there were at least one hundred persons at the fire.

"Mr. Haweth, another witness for plaintiff, testified, that in March, 1856, W. E. Bird's house was set on fire. (This was said by the witness as to date merely.) The defendant objected to this evidence, as irrelevant, and moved the court to exclude it from the jury; but the court overruled the objection, and the defendant excepted. Said witness further testified, that on Sunday morning, either the day after Bird's house was set on fire in March, 1856, or one week after that time, he was passing by the livery-stable owned and kept by John A. Bell, when he heard voices in the stable, and, as he approached, heard the voice of John A. Bell saying, 'That's right, damn 'em, burn 'em up.' The defendant objected to those words being given in evidence, because they were not relevant evidence; but the court overruled the objection, and the defendant excepted. The witness then stated, that when he reached the door of the stable, he saw John A. Bell and the slave Pleas standing in a small room of three sides; that he could see all over the room from the sidewalk, and there was no one in it except said Bell and Pleas; that he saw no other person in any other part of the stable, but could not say whether or not there were other persons in the stable; that when he reached the door, Bell came out, and shook hands with him, and they conversed one or two minutes; that Pleas walked off towards the back part of the stable, as Bell came out, and looked back towards witness two or three times. Said witness stated, on cross-examination, that the words mentioned were all that he heard before Bell came out to him, and he could not recollect anything that Bell said to him. He also proved the value of the plaintiff's house and furniture that was burned. Mr. Wilson, another witness for plaintiff, testified, that when he first saw plaintiff's house on fire, the fire was at the south-east corner of the kitchen, was much wider at the bottom than at the top, and had nearly or quite reached the shingles; that he could not say whether or not the floor of the

kitchen was burned when he reached the fire, and that the door of the kitchen was then open.

" The plaintiff having here rested his case, the defendant introduced one Beard as a witness, who testified, that he lived at the extreme north end of the street on which the court-house stands, more than half a mile from the plaintiff's house; that he was asleep on the night plaintiff's house was burned, and was awakened by his wife, and then heard bells ringing; that he put on some of his clothes, and ran towards the fire with the others in his hand; that when he reached the foot-bridge mentioned by Commelander, he turned off a few steps from the road, and stopped a short time from necessity; that he then went on, and crossed the foot-bridge at the same time with Commelander; that they met a slave on the bridge, whom witness thought to be Pleas; that the said bridge is about three hundred and fifty yards from plaintiff's house; that witness ran on to the fire, and when he reached it, the kitchen had fallen in, the main body of the house was burned, except the frame-work, which was falling, and the fire was then on the north wing. Mrs. Elliott, another witness for defendant, testified, that she was housekeeper at Duckworth's hotel at the time plaintiff's house was burned; that the room in which she slept adjoined the servants' room; that Pleas had a wife at the hotel, and she knew him very well; that she was awakened by the ringing of the bells, and heard the slaves talking in the back yard near her room, and heard the voice of a man whom she believed to be Pleas from the voice; that she had frequently seen him for two or three months before the fire, and always in his wife's house; that she did not see him in the streets, and did not know of his doing any work; and that if he was ever sick, she did not know it. The defendant proposed to prove that, at the time this suit was commenced, the slave Pleas had been indicted for the burning of plaintiff's house, and that the indictment was still pending at that time, and the prosecution undetermined. The plaintiff admitted these facts to be true, but objected to the evidence as irrelevant. The court sustained the objection, and the defendant excepted.

" This being all the evidence, the defendant asked the court, in writing, to charge the jury as follows : '1. If the evidence does not satisfy the jury that the plaintiff is entitled to recover, then a mere preponderance of evidence will not entitle him to recover.' '2. A mere preponderance of evidence will not entitle the plaintiff to recover, unless the evidence satisfies the jury that Pleas burned the plaintiff's house, and that John A. Bell, before the burning, commanded, encouraged, or persuaded said slave to do the burning, or consented that said slave should burn the house.' The court refused each of these charges, and then instructed the jury, that there could be no sufficient preponderance of proof in favor of the plaintiff, to entitle him to recover in this action, unless the evidence satisfied their minds that the slave Pleas burned the plaintiff's house, and that said Bell ordered, commanded, and assented to the act. The defendant excepted, both to the refusal of the charges asked, and to the charge given by the court."

The errors assigned embrace the overruling of the demurrer to the entire complaint and to the fourth count, the rulings of the court on the evidence as above stated, the refusal of the charges asked, and the charge given by the court.

E. W. PETTUS, for appellant.—1. The demurrer to the entire complaint should have been sustained. Case and trespass cannot be joined.—Sheppard v. Furniss, 19 Ala. 760.

2. The demurrer to the 4th count was well taken. The private wrong was merged in the felony, and the count does not aver that Bell was prosecuted before the commencement of the suit.—Boody v. Keating, 4 Greenl. 164 ; Martin v. Martin, 25 Ala. 201 ; Morton v. Bradley, 27 Ala. 640. Nor does it distinctly appear that Bell was prosecuted for the felony charged, nor is it averred that the slave was prosecuted for the felony. The count is defective for the further reason, that it does not show with reasonable certainty that Bell caused the burning.

eggett v. Simmons, 7 Sm. & Mar. 348 ; 1 Chitty's Pl. 81 ;

1 Ala. 173; 22 Ala. 629; 19 Wendell, 345; 1 Bla. Com. 431; 1 Smith's L. C. 560.

3. The statement of W. E. Bird, "that an attempt was made to burn his house in May, 1856," was irrelevant evidence. There was no evidence tending to show that Bell knew anything of the burning of Bird's house, which occurred three months after the burning of the plaintiff's house, and while the slave Pleas was in jail. The evidence was palpably irrelevant, and was calculated to prejudice the minds of the jury.—Brock v. The State, 26 Ala. 104. The same objections apply to the statement of the witness Haweth, that Bird's house was set on fire in March, 1856. No evidence is admissible, which does not tend to prove or disprove the issue.—Stark. Ev. 386; Roscoe's Cr. Ev. 73.

4. The advertisement was illegal and irrelevant evidence, and its admission cannot be sustained on any known principle.

5. The objections to Bird's statement about the *mittimus*, were well taken. The evidence was both secondary and irrelevant.

6. Bird's intention, as to what question he would ask Bell, was not relevant evidence, and only tended to prove that he entertained suspicions against Bell and sought to entrap him.

7. The statement of the witness Taylor, as to the jesting remark made by Bell, several months before the burning of plaintiff's house, when he was purchasing the slave Lewis, was an attempt to prove Bell's character by his conversation. What probable influence, relevant to the issue, can be drawn from it? Neither Bell's character, nor particular acts or words tending to prove his disposition, could be admitted as evidence in this case.—Wharton's Amer. Cr. Law, (3d ed.) 295, note; Dowling v. The State, 5 Sm. & Mar. 664; Ward v. Herndon, 5 Porter, 382; 1 Phil. Ev. 81; Roscoe's Cr. Ev. 89; 1 Greenl. Ev. § 52.

8. The witness Haweth was allowed to testify to a single, isolated remark, overheard by him, which was made by the defendant, long after the burning of plaintiff's house, in his own stable, to his own servant, and in

a tone loud enough to be heard on the street. How could such a remark, made under such circumstances, with no word preceding or following to explain or give point to it, become the foundation for a probable influence of any fact relevant to the issue? Before it could be supposed to relate to the burning of Bird's house one day or one week before, it must be assumed, without a shadow of evidence, that the slave burned the house, and communicated that fact to his master. But, after making these two assumptions, the relevancy of the evidence is not made to appear, because the burning of Bird's house had no connection with the burning of Troy's house two months previously.

9. The defendant should have been permitted to prove that, at the commencement of this suit, there was a prosecution pending against Pleas for the burning of plaintiff's house.

10. The two charges asked by the defendant, should have been given. The correctness of the first is shown by the following authorities: Mays v. Williams, 27 Ala. 267; Godbold v. Blair, 27 Ala. 592; Satterwhite v. The State, 28 Ala. 65; Lindsey v. Perry, 1 Ala. 203; 1 Stark. Ev. 451–52. When a proper charge is asked, it should be given as asked; and the error of its refusal cannot be cured by giving a charge of equivalent import.—Ivey v. Phifer, 11 Ala. 535; Clealand v. Walker, 11 Ala. 1058; Hinton v. Nelms, 13 Ala. 222; Cole v. Spann, 13 Ala. 537; Phillips v. Beene, 16 Ala. 720; Code, § 2355.

ALEX. WHITE, contra.—1. The demurrer to the 4th count, and to the entire complaint, was properly overruled.—1 Chitty's Pl. 180–81; Nelson v. Bondurant, 26 Ala. 350; Blackburn v. Baker, 1 Ala. 173; Lindsay v. Griffin, 22 Ala. 630.

2. The statement of the witness Bird, as to the attempt made to burn his house, was intended merely to explain the subsequent conversation between him and Bell in reference to it. The advertisement was a part of the conversation between the witness and Bell, and was admissible on the principle of res gestæ. The fact that the witness

obtained a *mittimus* for the commitment of the slave, was no part of the contents of the paper, and might be proved without the production of the paper.—Snodgrass v. Decatur Bank, 25 Ala. 174: Dixon v. Barclay, 22 Ala. 370; Graham v. Lockart, 8 Ala. 9. The accuracy of the witness' recollection had been somewhat impeached on his cross-examination, or an attempt had been made to throw doubt on his statements; and it was admissible for the party who introduced him, on re-examination, to refresh his recollection, and give value to his statements, by calling out the reason why the facts were impressed upon his memory. If the evidence was not admissible on this ground, it was immaterial, and its admission would not authorize a reversal.—Parsons v. Boyd, 20 Ala. 112; Seabury v. Stewart & Easton, 22 Ala. 207.

3. The testimony of Taylor, to which objection was made, was competent evidence. The remark to which he testified, whether made seriously or jestingly, was a pregnant circumstance against the defendant. It was a strange subject for an honest man to be jesting about. The most natural explanation of the fact is, that Bell, conscious of his guilty purposes, and the strange fact of his buying up "these smart negroes," thought to divert suspicion by affecting to jest about it.

4. Haweth's statement, that an attempt was made to burn Bird's' house in March, 1856, was merely introductory to his further statement about the remark overheard by him in Bell's stable, and was intended to fix the date of that remark; and the circumstances under which the remark was made, taken in connection with the burning of the two houses, made it proper for the consideration of the jury. The conversation ceased when the witness was seen, and the slave walked off, looking back several times at the witness.—17 Ala. 624; 28 Ala. 71.

5. The civil action against Bell was not merged in the felony of Pleas; consequently, the pendency of the indictment against the latter was not competent evidence. Blackburn v. Minter, 22 Ala. 616.

6. Both of the charges asked were calculated to mislead and confuse the jury, and ought, for that reason, to have

14

been refused. The charge given by the court was equally favorable to the defendant, and the court had a right to give it.—29 Ala. 204 ; 28 Ala. 89 ; 27 Ala. 594 ; 22 Ala. 20; 20 Ala. 108 ; 1 Ala. 423.

STONE, J.—If the slave, Pleas, burned the dwelling-house of Mr. Troy, there is no pretense that such burning was the result of negligence on his part in the performance of any act as the servant of Mr. Bell. No count in the complaint presents this view, and no part of the evidence tends to prove such state of facts. Taking the statement of the burning as given in any one of the counts of the original and amended complaint, it constitutes the crime of arson in the guilty perpetrator.—Code, § § 3185, 3188.

Section 3526 of the Code abolishes "the distinction between an accessory before the fact and a principal, and between principal in the first and second degree in felony." Arson, either in the first or second degree, is a felony.— Code, § § 3193, 3071.

It results from these plain principles, that a count which charges that Pleas willfully burned the dwelling-house of plaintiff, and that said slave was instigated and persuaded thereto by the defendant, is, in form, a count in trespass, and charges the defendant with the commission of a felony.

On the other hand, some of the counts, in both the original and amended complaints, charge on the defendant's intestate no actual or intentional procuration of the arson, but seek to base his liability on his negligently permitting Pleas, his slave, and of known bad character, to run at large, contrary to law. These counts, if they have any legal validity, are in case, and should not have been joined with a count in trespass.—Wilkinson v. Mosely, 30 Ala. 571, and authorities cited; 1 Smith's Lead. Cases, notes of Hare & Wallace, 559, 560 ; 1 Chit. Pl. 81.

We decline, however, to reverse this case on this ground, for the following reasons :

1. We are not fully convinced that any effect can be

given to the counts in the complaint which are made to take, the form of counts in case, because it is exceedingly doubtful if the owner of a slave can be made liable, in the form attempted in said counts, for losses consequent on such misconduct of his slave. [See 1 Smith's Leading Cases, 560 ; 1 Chit. Pl. 81 ; Dargan v. Mayor, 31 Ala. 469 ; 1 Bla. Com. 431 ; Blackburn v. Baker, 1 Ala. 173 ; Lindsay v. Griffin, 22 Ala. 629 ; Leggett v. Simmons, 7 Sm. &. Mar. 348 ; Wright v. Wilcox, 19 Wend. 343.] Consequently, if such counts set forth a state of facts on which no legal liability can be predicated, possibly the doctrine of misjoinder of counts could not be applied. It may be, that a complaint, thus framed, would present a simple case of surplusage.

2. Although the circuit court overruled the demurrer for misjoinder of counts, yet the demurrer was sustained to every count but one. If the court had sustained the demurrer for misjoinder, the plaintiff would have had leave to amend.—See Code, §§ 2254, 2256 ; Wilkinson v. Mosely, 30 Ala. 562. Under such ruling, he might have offered his fourth count as an amended complaint;in which event, the trial and the various rulings would probably have been identical with those found in this record. The question might arise, then, if we should entertain the opinion that the court should have sustained the demurrer for misjoinder, should we or not hold that it was error without injury, seeing that the evils and inconvenience of misjoinder have been removed, by the action of the court in sustaining defendant's demurrer to all the counts save one.

As we shall hereafter show, the judgment in this case must be reversed on other grounds. When the case is remanded to the court below, these difficulties in the pleadings may be remedied by proper amendments ; either by changing the counts in case, or by striking them out. For this reason, we decline to announce any opinion on the questions discussed above, further than is therein expressed.

The fourth count of the complaint was also demurred to ; and the demurrer to it being overruled, the trial was

had on that count alone. We decline to consider any of the causes of demurrer which were assigned to the fourth count, except that after stated.

Under the rules above declared, the fourth count avers a felony committed by the defendant's intestate. Its gravamen is, the injury to plaintiff resulting from the commission of the alleged felony. Under a well established and uniform rule in this court, the civil injury was merged in the felony, and the party aggrieved can maintain no action against the wrongdoer for personal redress, until the offender has been prosecuted, and the prosecution terminated.—McGrew v. Cato, Minor, 8; Morgan v. Rhodes, 1 Stew. 70; Middleton v. Holmes, 3 Porter, 424; Beazley v. Mitchell, 9 Ala. 780; Blackburn v. Minter, 22 Ala. 613; Martin v. Martin, 25 Ala. 201; Nelson v. Boudurant, 26 Ala. 341; Morton v. Bradley, 27 Ala. 640.

It is objected to the fourth count, that it does not aver that the alleged act of instigation and persuasion of the slave Pleas, by Mr. Bell, took place in Dallas county; and hence that the averment, that "the said defendant was duly and diligently prosecuted before the grand jury of said county, who inquired diligently into the charge of said burning, and found no true bill against the said defendant," is insufficient: that it fails to show that the said grand jury had jurisdiction to inquire of said offense.

Under very technical rules, perhaps this averment is defective. It can, however, be amended, when the case returns to the circuit court for further proceedings.

The report of the case of Nelson v. Bondurant, supra, does not inform us whether the counts of the declaration filed in that case disclosed the fact that the killing took place in Perry county, before a grand jury of which county the alleged prosecution was conducted. We have looked into the record of that suit, and find that each count contains that averment. Hence, that case is not an authority on this question. We, however, deem it unnecessary to comment further on this objection, as the defect, if it be one, can so easily be remedied.—Code, § 3526, last clause; Bishop v. The State, 30 Ala. 34; Sheppard v. Furniss, 19 Ala. 760.

The question of the relevancy of evidence, can never be reduced to rules of universal application. Much must depend on the circumstances of each particular case. It is said that evidence must be confined to the point in issue; and yet, in some cases, evidence may be received of facts which happened before or after the principal transaction, and which had no direct or apparent connection with it.—See 1 Greenl. Ev. § § 51, 53. Some questions necessarily open a wider range of incidental investigation than others. It may be observed that, generally, only those facts and circumstances which tend proximately to elucidate some proposition clearly involved in the issue, can be the subject of proof.—1 Greenl. § 52. This, however, fails to furnish an unerring guide for each case; for, in some issues, the propositions clearly involved, are much more numerous than in others.

Again, some propositions rest, for their establishment, on circumstances alone. In some cases, these circumstances are far more numerous than in others. Moreover, the circumstance itself is sometimes unmeaning or umambiguous, when viewed abstractly. Viewed in connection with other circumstances, or in the light of collateral, though, of themselves, immaterial facts, it sometimes becomes palpably and impressively pertinent. In prosecutions for crime, where the testimony is circumstantial, the most material evidence is frequently of this kind. Among the evidences of guilt in such cases are enumerated the demeanor, conduct and conversation of the accused; inconsistent and contradictory statements, and the statement by him of falsehoods in relation to matters sometimes connected very remotely with the principal transaction. In proving the falsehood of these statements, it frequently becomes necessary that collateral facts, otherwise immaterial, should be explained to the jury. As elucidating this subject, see Johnson v. The State, 17 Ala. 618; Martin & Flinn v. The State, 28 Ala. 71; Liles v. The State, 30 Ala. 24.

It may be urged that this is not a criminal prosecution. The rules, as to the relevancy of evidence, are generally the same both in civil and criminal proceedings.—Roscoe's

Cr. Ev. 1; 1 Greenl. Ev. § 65. Moreover, the charges found in the complaint under which this trial was had, impute to defendant's intestate a crime of high grade.

Applying these rules to the present case, we think the circuit court, for reasons hereafter stated, erred in permitting the plaintiff to prove that the dwelling-house of the witness Bird had been set fire to in May, 1856.

The court also erred, in permitting the advertisement of $100 reward, as published in the newspaper, to be read to the jury at the instance of plaintiff. It formed no part of the conversation between the witness and defendant's intestate. It simply furnished the occasion of that conversation. It contained nothing which could tend to explain, injuriously to defendant, any admission made in that interview, as testified to by this witness. There was nothing said by intestate, or by his father in his presence, so far as we are informed, which tends to prove either an express or implied admission by intestate, of the truth of what is at least insinuated in said advertisement; and consequently, the advertisement was not legal evidence as an admission, express or implied.—Fuller v. Dean, 31 Ala. 654. Whether this advertisement would have been legal evidence for defendant, if he had offered it as explanatory of his self-sought interview with the witness, we need not inquire.

The exception in regard to the *mittimus* was not that the evidence was, *per se*, inadmissible and irrelevant. The ground of objection stated was, that secondary evidence was offered, without accounting for the absence of the primary evidence. As this question will probably not arise again in its present form, we need not determine whether the objection was well taken.—See Graham v. Lockhart, 8 Ala. 9; Snodgrass v. Br. Bank at Decatur, 25 Ala. 161, 173, and authorities cited.

It was permissible to prove by the witness, Mr. Bird, a reason why the circumstances to which he testified were impressed on his memory, unless the reason involved the introduction of matter improper for the jury to hear. Certainly it was competent for him to state, in confirmation of his recollection, that his attention, during the ex-

Bell's Adm'r v. Troy.

amination of Mr. Bell, was particularly directed to the facts about which he was testifying. Perhaps it would have been enough, in this connection, if the examination had simply called out the fact, that the transaction was impressed on the memory of the witness, because of the conflict between the testimony given before the magistrate by the intestate, and his former unsworn statement to the witness. We think, however, that it is unnecessary to decide this question, as the witness' statement of the motive which prompted him to examine, as he did, the witness Bell, was probably already made fully manifest, by this witness' evidence of the questions addressed to Mr. Bell, and his answers thereto. The answer objected to may not have exerted any influence in the deliberations of the jury, and the question will not probably again arise in its present form.

There was error in admitting the remark of defendant's intestate, commencing with the words, "Some folks object to these smart negroes," &c. It is not apparent—made at the time it was—that it could have had any relation to the burning of Dr. Troy's house. It should not have been received.—Brock v. The State, 26 Ala. 104; 1 Greenl. Ev. § 52; Dowling v. The State, 5 Sm. & M. 664; Ward v. Herndon, 5 Porter, 382.

The two questions raised on the testimony of the witness Haweth we will consider together. The plaintiff's house was burned on the night of February 10th, 1856, under circumstances which induced, in some persons, the belief that it was the work of an incendiary. In March following, the dwelling-house of Mr. Bird, brother-in-law to the plaintiff, took fire in the night-time; also the work, as some persons supposed, of an incendiary. On the day succeeding, or a week after the ignition of Mr. Bird's dwelling, the testimony of the witness tends to show that he heard defendant's intestate say to the slave Pleas, " That's right, damn 'em, burn 'em up." We think the collateral fact, that Mr. Bird's dwelling took fire, without any known accidental cause, so soon after the destruction by fire, and also without known accidental cause, of the dwelling-house of his brother-in-law, the plaintiff, was a

legitimate subject of proof, to be weighed by the jury in determining to what Mr. Bell referred, when he made to Pleas the remark deposed to by this witness, if he made such remark. We think, also, that with this preliminary proof, there was no error in permitting the witness Haweth to testify to his understanding and recollection of the remark he overheard at the stable, and which he attributed to defendant's intestate.

The effect which the jury will allow this evidence to have, is not a pure question of law, but is more a question for them. Of course, they must first be satisfied that the remark was made, and by Mr. Bell to the slave Pleas. Then the inquiry will arise, to what did the remark have reference? There is always great delicacy, and should be corresponding caution, in assigning to an isolated expression, incomplete within itself, a particular meaning, in the absence of all proof of what preceded and led to it. We here refer approvingly to what we said in relation to suspicious circumstances, in the case of Liles v. The State, 30 Ala. 24.

As an independent fact, it was certainly not permissible to prove on this trial that another dwelling-house had been attempted to be burned.—1 Greenl. Ev. § 52.

We are not able to perceive on what principle the defendant sought to prove that an indictment had been found against Pleas, and was yet undetermined, for the burning of plaintiff's dwelling-house. While civil injuries, and the right to obtain redress for personal loss, are merged in the felony, and cannot, as against the felon, be redressed until a prosecution for the crime against the State has been set on foot and determined, this disability extends no farther than to the right to sue the felon himself.—See Beazley v. Mitchell, 9 Ala. 780.

We are not prepared to say that the two charges asked by defendant should not have been given. They seem to be free from objection.—See authorities on brief. On the other hand, the affirmative charge given appears to be quite as favorable to defendant as those refused, if not more so. It covers the same ground as that taken in the two which were refused. In such case, if the charge

asked be free from involvement, or tendency to mislead, it is the duty of the court to give the charge in the precise language of the request.—Code, § 2355. Should there be apprehension, in the mind of the presiding judge, that the charges thus given at the request of either party had placed in undue prominence before the jury any particular phase of the case, it would be his privilege, if not his duty, to give an additional explanatory charge, so as to present before the minds of the jury a fair and impartial statement of the various questions on which they are called to pronounce.

As this case goes back for another trial, we deem it unnecessary to comment further on the charges.

Reversed and remanded.