(Judge Woodbury, of the Seventh Circuit, taking the place of Judge Caldwell.)

### *MARY E. BRECK and L. A. BRECK v. STATE OF OHIO.

**1. TRUTH OR FALSITY OF RECITALS MAY BE SHOWN.**

In a criminal action for forging a will, the will claimed to be forged containing recitals of facts, the truth or falsity of these facts may be shown as bearing upon the question of the genuineness of the will, for their falsity makes it improbable that they were made by the testatrix.

**2. ACTS INCONSISTENT WITH RECITALS MAY BE SHOWN.**

Where these recitals are of the feelings of the claimed testate, her acts and declaration may be introduced to show, that her feelings were not those recited in the alleged will.

**3. DECLARATIONS NEED NOT BE EXACTLY CONTRARY TO THOSE IN WILL.**

It is not necessary that she should have said directly that her feelings were not those recited in the alleged will. Declarations which are the natural expressions of feelings, inconsistent with such a state of feeling as is recited in the will, are admissible to disprove the recital. For instance—the recital in the alleged will being that Mary E. Breck was her "only true friend on earth," it is admissible to show that she said she considered said Mrs. Breck "a scheming and dangerous woman."

**4. DECLARATIONS BEFORE AND AFTER DATE OF WILL ADMISSIBLE.**

For this purpose declarations apparently the natural expression of feeling, made·a reasonable time before the date of the alleged will, may be admitted, and where they are introduced, evidence of similar declarations made shortly after the date of the alleged will, are admissible as tending to show a continuance of such feeling.

**5. QUESTION IMPROPER, BUT SUPERFLUOUS.**

An expert in this case on direct examination, after he had testified that the signature to the alleged will was forged, was asked if he would pay a check so signed. He answered he would not. Held: the question was improper, but the answer under his previous testimony was immaterial, and not substantial injury.

**6. COURT SHOULD NOT CHARGE AS TO WHAT EVIDENCE IS BEST.**

Where experts gave their opinion as to the genuineness of a signature, some pointing out the facts on which they were based, and some not, it is not error to refuse to charge that the facts have greater weight than the opinions, for this would be telling the jury what evidence was the best, and to what they should give most force.

**7. EVIDENCE AS TO WHY WITNESS REMEMBERS FORMER TESTIMONY.**

A witness cannot state, as the reason why former testimony was impressed upon his memory, his conjectural conclusion therefrom as to the intention of the prosecuting attorney in conducting the examination.

**8. EACH CIRCUMSTANCE NEED NOT BE PROVED BEYOND A REASONABLE DOUBT.**

Where reliance for conviction is upon circumstantial evidence, it is not necessary that a circumstance should be proved beyond a reasonable doubt, unless it is a necessary link in a chain of circumstances, which chain of circumstances is necessary to a conviction. A person may be properly convicted by a large number of circumstances, no one of which alone is established beyond a reasonable doubt.

**9. REVIEWING COURT MUST HAVE EVIDENCE JURY HAD.**

Where a reviewing court is asked to review on the weight of evidence a question of

---

* This decision was affirmed by the supreme court, without report, March 26, 1889. The opinion in this case is followed by the circuit court in Corbett v. State, 3 Ohio Circ. Dec., 000, 000, 000, 000, 000, (s. c. 5, C. C. R. 155).

forgery, the alleged forged paper and the genuine signatures introduced should, in some manner, be made a part of the bill of exceptions.

10. Reviewing Court Will Consider Materiality of Testimony.

In a long trial, it rarely happens that, in every respect, one judge would rule on evidence as another does, hence the reviewing court, before reversing, will consider the materiality of testimony, and whether it was likely to do any injury; otherwise a long case would scarcely ever be confirmed.

Baldwin, J. (oral opinion.)

This case is a petition in error, filed by the Brecks, to reverse the judgment of the court of common pleas on an indictment under which the plaintiffs in error were found guilty of forging the will of Martha Hall McDonald, and the judgment of the court below was, that the plaintiffs in error be sentenced to the penitentiary of the state of Ohio for the term of four years each, and they are each of them in the penitentiary.

The instrument which is charged to be forged, is this:

"Cleveland, Ohio, December 23, 1886. I, Martha Hall McDonald, being this 23d day of December, 1886, sick, but of sound mind and memory, do make this my last will and testament.

"The day Joseph and John came they all three urged me to make my will, and so bewildered and crazed me that I forgot my promise and obligation to my only true friend on earth, Mrs. Mary E. Breck. Mrs. Breck is the one to whom I have gone in all my troubles and sickness for several years, and she has promised to care for me so long as I live and attend to me in my last sickness, and I agreed to give her all or nearly all of my property. Mrs. Breck has kept that promise to my full satisfaction, and as there is no reason why I should care anything for my relations, none of whom I have seen before for 33 years, I therefore annul the will I made, I think, December 14, 1886, drawn up by the book agent, Mr. Hewitt, and signed as witnesses by my brothers Francis and John.

"Therefore I now bequeath to Mrs. Mary E. Breck all of my real estate, extending through from No. 241 Washington street to Vermont street, and the remainder of my lot in Riverside cemetery.

"To my son Joseph I bequeath my bank account, in consideration that he is to pay the expenses of my funeral.

"Mrs. Breck is to furnish a monument for myself and John, my husband's grave, not to cost more than $100 nor less than $80.

"The Jones girls are to have two months' rent free.

"Give Mrs. Gorie some bedding, and give Mrs. English some bedding and some coal, if any be left.

"Of my household goods, Joseph is to have what he likes, the rest to go to Mrs. Breck. I want Mrs. Breck to take charge of my funeral and to settle my estate according to the provisions of this will, and also she is not to give any bonds. Now, may God have mercy on my poor soul, Amen"—which paper purports to be signed by "Martha Hall McDonald." It is admitted that the body of this paper is in the handwriting of Mrs. Breck. The attestation, it is admitted, is in the handwriting of Mr. Breck, and the attestation is signed by Mr. Breck, by a Mr. Harper, and by a Mr. Corbett, and these various witnesses all swear that they were present when this will was executed by Mrs. McDonald.

The testimony covers between twelve and thirteen hundred pages, and has been very largely directed to showing a great many circumstances which, it is claimed, are such that the combined influence of those circumstances should convince the jury beyond a reasonable doubt that this was a forged will. The number of classes of exceptions to the rulings upon evidence is not large, but there are very numerous items of evidence that would be governed by the rules one way or the other. The most anxiety was shown about the declarations made at various times by Mrs. McDonald. The state introduced in its case a large number of rep-

resentations or declarations made by Mrs. McDonald, sometimes in writing, through the interposition of somebody who wrote for her, or sometimes by word of mouth. A few of these declarations were made after the alleged execution of this will. It is claimed by the petitioners in error that the issue in this case being forgery, the declarations of Martha McDonald, the deceased, are not admissible for the purpose of proving that this will is forged; and a case that is very greatly relied upon by them is in the 28th N. J. Law, which lays down, as do other cases, this doctrine (I quote from the brief furnished by the petitioners in error):—

"Where the execution is in the manner required by law, no declarations other than such as are a part of the *res gestae* are competent to prove a forgery, or disprove its due execution."

It is a long case, occupying over 200 pages, and we have examined it with a great deal of thoroughness. But the case sifts down to what may be found on the 4th page of the opinion, page 278:

"It is manifest from the state of the case and the course of the argument in this court upon this rule, that the plaintiffs relied upon the declarations and conduct of Meeker, both before and after the day of execution, to show that while living he never knew of the existence of such a will, and that therefore he had never knowingly executed the paper."

That fairly supports the claim made by counsel for plaintiffs in error, if it be understood to cover any direct declaration as to whether the will was forged or not. It is very plain, and there is no dispute about it, and we fully coincide with the case in 28 N. J. Law R., that a declaration made by the decedent that she had not executed such a will, or had not executed a will, or any statement which she might make in regard to it, which was made as bearing directly, as an assertion as to the fact of the existence of such a will, would not be admissible for that purpose. Then, if these many declarations made by Mrs. McDonald are to be admitted in this case, it must be upon some other ground than that her declarations are to be admitted as bearing directly upon the question of the existence of this will. And they were not undertaken below to be introduced for that purpose. It was said that in this will there were recitals, of her feelings towards her own family and towards Mrs. Breck, and that these declarations of hers were admissible, not for the purpose of proving directly the facts that might be stated in those declarations, but for the purpose of showing that she had or had not such feelings, that they might bear upon her mental condition, as far as her mental condition was proper to be inquired into in this case. The field in regard to mental condition, sometimes, where there is charged undue influence or insanity, is very wide; here it comes within a comparatively narrow range. Mrs. McDonald was born in Lower Canada, not far from Lake Champlain, New York, and when she was a young woman, and before her marriage had a son, who was named Joseph; and not long after the birth of that son she left home, and had been away from home over 30 years—and had communicated with her family possibly for that length of time. She had brothers, William, Francis and John. She went from Montreal to her home, where her son Joseph was born; shortly after she went to Troy, and then South, and then she came here, and was married to a man by the name of McDonald, who lived with her on the West Side, and whom she survived. They owned property there—real estate—and she had money on deposit in the Savings Bank amounting to some $2,000, or more. In the latter part of 1886 she became very sick with what turned out to be her fatal illness; and having sent out for her relations, on the 15th of December, 1886, she made a will in which she gave the property substantially to her son Joseph. Her son Joseph was here, and her brothers John and Francis, William being dead; and after her death this will in contest was produced, dated eight days after the other. Mrs. Breck had been with her and had taken care of her more or less, and the recitals, perhaps, which are made in the will itself, show to a degree what Mrs. Breck claimed about it. But there were a very unusual number of recitals in this will. She says, in the outset, that Joseph, John and

Francis all urged her to make this will on the very day they got here, and they so bewildered and crazed her—that in the first statement—that, second, she forgot her only true friend on earth, Mrs. Breck; then, third, that she had made an agreement with Mrs. Breck, by which Mrs. Breck was to care for her all her life, and by which she was to give Mrs. Breck all or nearly all of her property; she recites, fourth, that Mrs. Breck had kept that agreement to the full satisfaction of herself, Mrs. McDonald; she recites, fifth, that there is no reason why she should care anything for her relations, none of whom she had seen for 33 years—which may be fairly considered as a declaration on her part, combined with her statement about her friend, Mrs. Breck, that she did not care for her relations; she then states that this will of December 15th was signed by John and Francis as witnesses; and she states that she made arrangements with Mrs. Breck by reason of which Mrs. Breck was to take charge of her funeral.

Now, it is conceded on both sides that a proper line of evidence in this case on the part of the State, was to show that the recitals which were made in the alleged will of December 23, 1886, were false; that it was competent testimony to show that what was therein said was not true, because it was improbable that Mrs. McDonald would at that time make a will reciting in that will matters which she herself knew were not true; and there has been a large amount of testimony about various circumstances—to which no exception was taken—tending to show that these facts recited in the will are not true, and therefore that it was in the highest degree improbable that she made that will. Now, it is to be noticed that among these recitals are not only recitals of facts—for instance, there is the first recital, that these three persons urged her to make her will, and so crazed and bewildered her that she practically lost her senses in making the first will of December 15, she also recites, practically, that she regards Mrs. Breck as her only true friend on earth; and she recites her feelings towards her relations; and the purpose apparently of that recital was to show reasons,—whether made by Mrs. McDonald, or made by Mrs. Breck without the dictation of Mrs. McDonald—why Mrs. McDonald gave the larger part of her property to Mrs. Breck, who was no relation of hers—instead of to her son, who was her only living heir.

Then the mental feelings of Mrs. McDonald become substantial facts, facts that are recited in this will, and facts therefore to be sustained, or shown, or attacked as recited in the will, by the usual and proper testimony for such a purpose; this mode of attacking the will was a very proper mode. I will read very briefly from Wills on Circumstantial Evidence, page 141:

"The critical examination of the internal contents of written instruments perhaps of all others affords the most satisfactory means of disproving their genuineness and authenticity, especially if they profess to be productions of an anterior age. It is scarcely possible that a forger, however artful in the execution of his design, should be able to frame a spurious composition without betraying its fraudulent origin by peculiarities of writing or orthography characteristic of a different age or period, or by the employment of words of later introduction or by the use of them in a sense or meaning which they did not then bear, or by some statement or allusion not in harmony with the known character, opinions and feelings of the pretended writer or with events and circumstances which must have been known to him, or by a reference to facts or modes of thought characteristic of a later or different age from that to which the writing relates. A writer eminent alike for his critical sagacity and imaginative genius declares that he had met in his researches with only one poem which, if it had been produced as ancient, could not have been detected on internal evidence."

The matter is very fully illustrated; and that has been and must always be in the investigation of forgeries, substantially the line that is taken by those persons who attack the instrument that is claimed to be forged; because forgeries

are not done openly and in the sight of those persons who can testify directly to the existence of the forgery.

Then, in this case, we find that there are statements in the will of her feelings towards Mrs. Breck and towards her relations. We find that if those declarations are used at all, they should be limited simply to the existence of her feelings. The judge who tried this case below, early in the case, when these declarations first commenced to be admitted, very carefully cautioned the jury that they should regard these declarations solely for the purpose of bearing upon the truth of the recitals made in this paper in regard to her feelings towards her relations and towards Mrs. Breck; and in the charge he again cautions the jury. He says: "And you may carefully consider the instrument which is presented to you and over which this controversy arises—its provisions, its declarations and statements, and all that pertains to it—its signature; carefully scrutinize them; and you may take into consideration the truth or falsity of the declarations it may contain, which bear upon the reason why it was made and why it should have been made, which you may find contained in this instrument. In determining the truth or falsity of these statements, a certain line of evidence has been permitted to be given to you for the purpose of showing the feelings of Mrs. McDonald towards her relatives, her feelings towards the defendants in this case in regard to her property, for the purpose of bearing upon the question of the statements in this will in regard to how and in what manner the will of December 15, 1886, was made. This class of evidence of her declarations showing her feelings towards these parties, is simply to be used by you for the purpose of bearing upon the truth or falsity of the declarations of this instrument of December 23d in controversy; and when you have determined from the testimony which is submitted for that purpose, the truth or falsity of these declarations in this instrument, then you may give to them such force and effect as in your judgment they may be entitled to in determining the question of guilt in this case, by determining whether or not this will is a forged will of Martha Hall McDonald." So that it seems that the judge properly limited the use of these declarations. It is very evident, that the feelings and mental condition of persons can only be known by acts or by declarations. The declarations and acts of the party are primary evidence of their feelings, when their feelings are a proper subject of investigation—there is no other way in which they could be known; and the text books say, very properly, that that is the direct evidence in regard to the existence of such feelings. It is true that sometimes there may be some danger unless juries are carefully instructed, that they will carry these declarations further, and consider them as evidence of the truth of the statements that are therein made. But in this case the court seems to have carefully instructed the jury that they were to be considered simply for the purpose of bearing upon the existence of those feelings. That, the evidence of those feelings may be whatever is the natural expression of them is such good sense that it hardly needs any authority; but I will read a word from Greenleaf on Evidence, sec. 102: "Wherever the bodily or mental feelings of an individual are material to be proved, the usual expressions of such feelings made at the time in question are also original evidence, if they were the natural language of the affections, whether of body or mind; they furnish satisfactory evidence, and often the only proof of its existence." Then, whatever was the natural expression of a feeling, was the evidence of the existence of that feeling at the time at which that expression was given. But you cannot always get an expression of a feeling at the very time at which the act was done. There are cases where the subject of the mental condition is not of itself to be inquired into, where declarations made at the time the act is done are admissible as a part of the res gestae. But in a case where it is proper to inquire as a substantial fact—as in this case—in regard to the existence of feelings or a mental condition, it is always the case that the examination extends over a longer time than the bare few minutes within which the act pro-

Vol. II. C. C.—31

posed to be investigated was being done; because it is human experience that people have, for a time at least, more or less long, the same feelings; and the existence of a feeling a little before an act was done, would be evidence that that feeling existed at the time it was done; that is, if she had certain feelings for her relatives on the 15th or 20th of December, that would be evidence that she had the same feelings on the 23rd of December, 1886, unless there was some reason to believe that she had changed her mind in regard to them. A piece of evidence that was largely objected to, and which is perhaps a sample of the line which was taken in one degree, is a letter which was written by a man by the name of Stevenson for Mrs. McDonald, on the 22nd of November, 1886, addressed to her brother William, who was then deceased, of which fact she was in ignorance:—

"Cleveland, Ohio, November 22, 1886.

"Dear Brother William,—I now sit down to write you a few lines to let you know that I am very poorly, and I want to know where Joseph is, or if you can send him here to take care of me, and I will send him a pass to bring him here; and if he does come I will have him pretty well off; all I have I will leave it to him. My husband has been (the word "dead" is left out) over a year, and I have no one to care for me. I want you to write to me at once and let me know what of the family is living yet. If Joseph is at home I would like to have him come at once.

    "Your loving sister,             Martha McDonald.

"Address Mrs. McDonald, 241 Washington St., Cleveland, Ohio."

Now, there is no reason to doubt the authenticity of that letter. Mr. Stevenson, who has no interest in this controversy, swears that he wrote that letter at the dictation of Mrs. McDonald; and it shows that at the time she had a strong affection for her son, and that she was going to give all her property to him; and it shows pretty conclusively that at that time her feelings were different from the time at which the will was made which is claimed to have been forged, if it was genuine. We think that that evidence is admissible for that purpose, as also the oral declarations. One declaration made after the 23d of December was a statement on her part that Mrs. Breck was a scheming and dangerous woman. The rule laid down is that whatever is the natural expression of a feeling, whatever words may naturally be the result of a feeling, is evidence of that feeling; and although this statement is no evidence, and ought not to have been so understood by the jury, and probably was not, that Mrs. Breck was a scheming and dangerous woman, it seems pretty satisfactory evidence, if she did say that at that time (which of course the jury are to judge of) that Mrs. McDonald was not likely to regard as her only true friend on earth a woman whom she characterized as a scheming and dangerous woman.

In this matter of mental feeling, testimony is allowed of declarations made shortly after the event. The line is not very clearly drawn as to how long after a certain transaction these declarations may be made in order to be admissible; but a very leading case upon the subject is found in the 99 Mass., 112, the case of Shailer v. Bumstead. Commencing at page 120, the matter is fully discussed.

"So it is uniformly held that the previous declarations of the testator, offered to prove the mental facts involved, are competent. Intention, purpose, mental peculiarity and condition, are mainly ascertainable through the medium afforded by the power of language. Statements and declarations, when the state of the mind is the fact to be shown, are therefore received as mental acts or conduct * * * . If therefore the statement or declaration offered has a tendency to prove a condition not in its nature temporary and transient, by the aid of the recognized rule that what is once proved to exist must be presumed to continue

till the contrary is shown, the declaration, though prior in time to the act the validity of which is questioned, is admissible. Its weight will depend upon its significance and proximity  *  *  *  .

"Where a foundation is laid by evidence tending to show a previous state of mind, and its continued existence past the time of the execution of the will is attempted to be proved by subsequent conduct and declarations, such declarations are admissible, provided they are significant of a condition sufficiently permanent, and are made so near the time as to afford a reasonable inference that such was the state at the time in question."

We think in this case it was proper for the court to admit those declarations that were admitted by the court subsequent to the purported date of this will, and solely for the purpose indicated, and which was the sole purpose for which they were admitted.

There are various other questions raised by exceptions to the evidence. In defense Mrs. Breck had testified that Mrs. McDonald had made to her various statements. She said that Mrs. McDonald had related to her the history of her life; that she had said that in early life she had been seduced by her brother William, and that Joseph was the fruit of that incest; that she had been driven from home in consequence of that; and she related her subsequent life. She stated (so the testimony of Mrs. Breck was) that the disease with which she was then suffering, was syphilis given her by her husband; that she had previously had syphilis, and that the doctor had told her that if she ever had it again it would kill her. And the State on rebuttal introduced testimony tending to show that these statements, if made by Mrs. McDonald, were not true; in short, they undertook to show the improbability that Mrs. McDonald had said these things, by showing that there was no foundation in fact for those statements; that at the time at which that child must have been conceived, Mrs. McDonald was resident in Montreal, and that her brother William was at home, and that it was impossible that William should be the father of that child; and the evidence of physicians that Mrs. McDonald did not have syphilis; that the disease of which she died was cancer. That testimony was objected and excepted to; and it is said as a matter of hardship on the part of the plaintiff in error, particularly in regard to proof that William could not have been the father of Joseph, that Mrs. Breck herself in the defense—besides the declaration of Mrs. McDonald—undertook to show by other evidence that William was the father of Joseph, and was not permitted to do so. Now, when Mrs. Breck undertook to introduce that evidence in her own case, she was simply endeavoring to introduce the proof to show that a fact was true which had been stated to her by Mrs. McDonald—if she herself told the truth. It was introduced by her, not as a fact which bore upon the issues of the case; the fact whether William was or was not the father of Joseph did not bear upon the fact whether the will was forged. It only became of importance because Mrs. Breck stated that Mrs. McDonald told her so, and only as bearing upon the question as to whether or not Mrs. Breck told the truth. Then the state, in rebuttal, introduced evidence showing that this was not the fact. Now, inasmuch as they had introduced testimony tending to show that William was not the father of Joseph, it was competent for Mrs. Breck in rebutting that testimony to introduce testimony tending to show that William was the father of Joseph. But that was not where she endeavored to introduce testimony; she endeavored to introduce it in her own case in chief, when the only object of that testimony by her was to make it more probable that the statement made by her of a matter which was not material in the case was true. That is not the order which she should have taken in her testimony, and we think the court did right in the ruling which it made at that time. The testimony in regard to the non-existence of the syphilis, which was excepted to, comes under that same right, in regard to contradicting the existence of facts which Mrs. Breck had said that Mrs. McDonald said existed; it makes it more improbable

that Mrs. McDonald would have made that statement. And in fact, the syphilis of Mrs. McDonald was so fully testified to by Mrs. Breck, that the testimony was competent as a direct contradiction. There was a vast amount of testimony in regard to her sickness and the care she needed, and a fair share of Mrs. Breck's case was the condition she was in and the great care which she needed, and which Mrs. Breck claimed to have given her, and which was the consideration of this great kindness which she claimed Mrs. McDonald showed her.

The introduction of the first will, and all that took place at the execution of the first will, was objected to by Mrs. Breck. But it is to be noted that in this recital of facts, the will of December 23 goes on and recites that a will was made, Mrs. McDonald says (if that is true) she believes, on the 14th; as a matter of fact the will was made on the 15th; but there can be no doubt that the first will that is the subject of testimony in this case is the will that was meant to be alluded to by this paper. It is part of the testimony tending to show that the recitals of this paper are not true—the will, which in itself is not witnessed by Francis and John as said to be by the will of December 23, and also the circumstances under which it was made. If she recited in the very outset as the reason for making the will of December 23, that just as soon as her son and two brothers had got there they immediately urged her to make the first will and got her into such a mental condition that she was, to use the phraseology of the alleged will, "so bewildered and crazed," now it was certainly competent to contradict that by the introduction of that first will, (which, as I have said, showed on the very face of it that it was not attested by the persons cited to have witnessed it in this alleged will), and also by the circumstances under which it was made, as tending to disprove that she was bewildered and crazed through the importunity of her brothers and son when she made the first will; and substantially anything that was a part of that transaction was admissible—anything that was a part of the *res gestae.* Now it was in testimony—it appeared by the will itself, that she did not sign the will of the 15th of December, 1886; she had made her mark, and it was in testimony that she gave as her reason for signing by mark that she could not write; the jury probably did not understand—in fact they could not possibly have understood, from the fact that many of her signatures were introduced—that she did not know how to write, but as meaning that she could not write at that time, undoubtedly through sickness or weakness. That was a part of the transaction, and was properly admissible, and could not have prejudiced the plaintiffs in error, in the sense that she had never learned to write; we think that this was properly admissible as part of the *res gestae* of the making of the first will.

There was quite a number of exceptions made to testimony showing her anxiety about her relations. It commenced with the writing of the letter of November 22, written by Mr. Stevenson, and was followed by a letter that was written to a Mr. Cookman, her brother-in-law, by Mrs. Breck herself, at the request of Mrs. McDonald, and there was evidence offered that after a son came here she asked him to go home and then come back and stay with her. All that was objected and excepted to; but the testimony that she asked Joseph to go home and then come back, manifesting in that a desire to have him near her, was admissible for the sake of showing what her feelings were towards her relations. It showed just as plainly—this asking her son to come back—as asking him to come the first time, that she had such a feeling of kindness towards him and regard for him, that she wanted to have him present, instead of that entire disregard for her relations which would seem to be expressed by the will of December 23, and which was made after these relations were here at her request.

I have already considered the objections to the testimony of her brothers that William could not be the father of Joseph. The testimony of John was the

same, and an exception was taken to the testimony of the circumstances under which Mrs. McDonald left home.  But for the same reasons for which the testimony is admissible to disprove the recitals purporting to be made by oral declarations of Mrs. McDonald to Mrs. Breck, if the facts did not exist which she is said to have related, it makes it improbable that Mrs. McDonald made the statement, and to that degree tends to impeach Mrs. Breck, just as much as facts which are recited in the will and did not exist, tend to impeach the authenticity of the will.

There are one or two exceptions to testimony which we think are well taken; and one is the statement of the cashier, Mr. Severance, who was called to testify as to the genuineness of the signature of this will in comparing it with other signatures, and he was asked the question by the state and allowed to answer, whether he would pay a check so signed, and he said that he would not. We are of the opinion that that question and the answer were improper.  The next question to be investigated is the materiality of that testimony.  The rest of his testimony was, that the signature on the will was not a genuine signature, but a forged signature.  And it adds very little to the testimony of a cashier who testifies that the signature on a check is a forgery—it adds very little, in fact nothing, to his testimony to say that he would not pay a check so signed.  It is so perfectly obvious that it would be his duty not to pay such a check that to ask the question is merely superfluous, and could not possibly have injured the case of the plaintiffs in error.

Another question which was excepted to, the bearing of which, upon this case we do not exactly see, was whether Joseph found fault with his mother. It is a question which could not, really, we think, have affected the case one way or the other.  It very rarely happens in a case which has lasted as long as this, that all the way the judge who rules in these cases on the admission or exclusion of testimony, rules in every respect as another judge would.  Where, therefore, during the trial of a case, there are a hundred questions which are objected to and ruled upon, it is not to be expected that the rulings of the judge should in all cases be such as would be made by another judge.  But there is beyond that, the question of the materiality of the testimony—whether or not it was likely to do any injury.  And we can not see how, unless there was that salvation, in a trial which lasted for a month, there could ever be a case affirmed. And no one of us has been able to see any reason whatever why either of these questions should have been an injury to plaintiffs in error; they seem to be quite unnecessary and immaterial.  In one place Mrs. Breck was asked whether she expected any other compensation than that provided by the will for what she had done for Mrs. McDonald.  The court ruled out the question, and exception was taken.  But it was not more than a page before she testified fully to the very thing there excluded; so of course that exception is not to be noticed.  An exception was taken to a refusal to allow Mr. Neff, who was an attorney (he testified to the testimony given by certain witnesses upon the preliminary hearing of this case before the police judge), and he was asked what reason he had for remembering so well, as he seemed to, the testimony then given by that witness at that time, and the question was not allowed to be put, and an exception was taken to that.  It is ordinary practice to allow a witness to state such facts as may have specifically called his attention or impressed the matter upon his mind.  The plaintiffs in error stated as what they expected to show in answer to the question, that Mr. Neff thought that the State wanted to account for the time between half-past twelve and two o'clock on the 23rd of December, 1886.  Now, that was not a statement of a fact that happened that would have called his attention to that matter; it was his conclusion from the general way in which the State conducted its case; and it is a general rule of testimony that witnesses can not testify to conclusions of any kind, but only to facts, from which the jury are to draw conclusions, whether those conclusions are the main

facts upon which the issue is raised in the case, or conclusions which may only be of importance as bearing in some remote way upon the issues in the case. McBride v. Cicotte, 4 Mich., 478; Thomas v. State, 24 Ga., 287; Bell v. Troy, 35 Ala., 184; Wharton on Evidence, sec. 515; Shepard v. Willis, 19 O., 142.

I have substantially considered the objections which have been made to the evidence in the case. They range pretty much upon the classes that I have spoken about, and what few there are, if any, that do not come within these rules which I have laid down, we think there is no error in, to the prejudice of the plaintiffs in error, and we can not reverse the case for those reasons.

There were quite a number of requests made to the judge for charges. They were all refused except as to those given in the charge. Most were fully given in the charge—in regard to the kind of evidence, the value of the different kinds of evidence, what was a reasonable doubt, and various matters which were quite fully requested—were very fully covered by the charge. There were some that were not given in the charge. The second request was:

"We ask the court to say further, that where the proof is not positive, but must be drawn from a chain of circumstances, each one of those material circumstances must be established, beyond a reasonable doubt, and that all the circumstances, when thus established, must be inconsistent with the innocence of the accused."

The court told the jury that where there was a chain of circumstances that practically hinged upon one another, that the essential facts must be every one of them proved beyond a reasonable doubt, or else the defendants below could not be convicted on that evidence. And we think that in using that language, the court used language much more proper than that of the request. It is not true that in order to convict a person of crime, all those circumstances that may be material in the case must be established beyond a reasonable doubt. It is quite possible and probable, that there may be a large number of circumstances, no one of which will be established beyond a reasonable doubt, but yet the aggregate of those various circumstances, the number all pointing one way to the guilt of the accused, may be such that there can be no reasonable doubt that the accused is guilty of the crime that is charged. It is true, that when what is to be proved is supported by a chain of circumstances that are dependent one upon the other, that in order to convict of the crime on that proof each of these must be established; that is, that it is an essential fact that must be proved beyond a reasonable doubt; that was precisely what the court charged. But there may be, and are, in every criminal case, a large number of facts that are material, and all point (perhaps this much and that little, but nevertheless they are proper to be considered) in arriving at the conclusion of the guilt or innocence of the accused. They might just as well ask that a very large share of the evidence that is offered in criminal cases should be at once excluded; because, if this is correct, however material a matter may be, it is not to be considered at all as evidence unless it is established beyond a reasonable doubt.

The seventh request is: "If the recitals of the will of December 23, 1886, or some of them, are false, were they known to be false by Mrs. McDonald? If not known to be so, or if they were forgotten by her, or imperfectly remembered, then the fact that they were not true has no bearing in this case tending to impeach the will of December 23, 1886."

We think that charge, if it had been given by the court, would have been misleading and erroneous. The object of introducing this testimony to contradict the recitals of the will, is to show that it is improbable that Mrs. McDonald, at the time she is claimed to have made that will, would have made those statements of fact which began that will. Now, first, she would not have been likely to have made those statements unless she remembered them as existing facts. So that to make it depend entirely—to say that the falsity of those recitals is not to be considered unless the jury are satisfied that they were not forgotten by her.

or imperfectly remembered, is not to state the precise state of the matter. She would not probably have made those recitals unless she then believed—remembered—that they were true at that time. And it is in evidence in the case, by the testimony of at least one witness, that on this 23rd day of December, 1886, when that will is alleged to have been made by her (if that will was made by her), that the whole will was read to her at that time, so that the thing must have been in her mind. Perhaps I should have read in connection with this request the eighth request, which relates to the same subject:

"The falsity of recitals of this will, like other material facts essential to be established by the State, must be inconsistent and irreconcilable with any theory of the innocence of the defendants, even when considered in connection with the liability of Mrs. McDonald to err in her recollection of the facts, the liability of Mrs. Breck to incorrectly remember her statements, as well as the liability of Mrs. Breck to err in incorporating those statements into the body of the will on the following day, or at the time they were so incorporated into this will." Mrs. Breck had testified that she saw Mrs. McDonald on the 22nd of December, and that Mrs. McDonald told her what she wanted in the will, and that she drew it elsewhere and brought it to Mrs. McDonald's house. But the testimony was that when the will was brought in to be executed by Mrs. McDonald, it was read to her. Now they ask the court to charge the jury that the recitals of the will must be considered in connection with the liability of Mrs. McDonald to err in her recollection of the facts, the liability of Mrs. Breck to incorrectly remember her statements, and also the liability of Mrs. Breck not to remember the facts when she wrote the will, which obviously, when it is also a fact that the will was read over to Mrs. McDonald, calculated to mislead the jury, and was properly excluded.

The ninth request was: "Before any effect can be given to these statements of Mrs. McDonald for any purpose whatever, as bearing upon any issues which the State is bound to maintain in order to secure conviction, the jury must first find that Mrs. McDonald experienced no subsequent change of feelings or purpose toward her relatives or Mr. Breck, and in fact that she did have the same condition of mind on December 23, 1886, as on December 15, 1886."

If the jury were of the opinion that there had been a change of feelings between the 15th day of December, 1886, and the 23rd of December, 1886, testimony of her feelings as they existed on the 15th would not prove their existence on the 23rd. But there are two objections to be made to this request: In the first place, they say the jury must find that Mrs. McDonald experienced no such change of feeling. The jury would be likely to misunderstand that; the word "find" is not a happy one. It would be proper for the jury to consider the question whether or not there was a change of feeling, but not necessary that they should make any finding in that behalf. And then the fact is, that the existence of feelings on the 15th of December is presumptive proof that she had the same feelings on the 23rd of December, 1886. A state of feeling is presumed to continue (see the case I read in 99 Mass.) unless there is some evidence of a change; and the request is putting the burden of proof on the wrong side.

The tenth request is:—"The charge being that the said Martha McDonald had been defrauded in her property rights by the forgery complained of, if the jury find that prior thereto said Martha Hall McDonald had by a valid will or other conveyance, transferred all the property mentioned in said alleged will to other parties, then and in that case your verdict must be for the defendants."

There was no question whatever, as far as the testimony was concerned, but that the will that was made on the 15th of December, 1886, was at the time it was made a valid will; that is, that it was not to be impeached; and this is substantially a request to the court to tell the jury that that being a valid will, it was impossible to convict the defendants below, on the ground that there was no interest left Martha McDonald in her own property, and that therefore no crime against prop-

erty was committed. The request seems very unusual, but the fact at the bottom of it is, that a will does not operate until the death of the person, and it cannot be possible that at the moment a will is made, the property has passed to another person. The statement excludes the request at once.

The eleventh request is:—"The declarations of the said Martha McDonald made, not in the presence of the defendants, Mr. and Mrs. Breck, or either of them, nor in any manner connected with the making of the will of December 23, 1886, including the Stevenson letter of November 22, 1886, are not to be considered as evidence to impeach the validity of the will in dispute, or the signature attached thereto."

That comes back to the question we discussed at first, and it is that those declarations were not to be considered as direct evidence of the statements made in them. But, as we have shown quite fully, the statements, so far as they showed the mental condition of Mrs. McDonald, were proper for the purpose of negativing the statement of those feelings and conditions as recited in this will; and I hardly know whether this request was meant to cover substantially the doctrine with which we started out, that the declarations could not be introduced as direct evidence of the existence of the forgery. But if it were meant to save that and nothing more, the phraseology was very unhappy, because it says that these declarations could not be considered as evidence to impeach the validity of the will. These declarations are evidence to impeach its validity, by reason of the impeachment of the truth of the recitals in the will, and in that indirect manner to tend to impeach the validity of the will. The subject was completely covered by the charge.

The twelfth request is:—"The facts pointed out to the jury by the expert witnesses as the basis of the opinions they have expressed to you in their testimony are entitled to more weight in enabling you to determine the question whether said signatures are true or false, than the opinions expressed by said witnesses called as experts before you." There were quite a number of experts who testified that this signature was, in their opinion, a forgery, and some of them went quite fully into the facts upon which they based their opinion. The court charged the jury that the opinion of experts was to be taken with a good deal of care, and was not the highest kind of evidence, and told the jury that they must consider those opinions in connection with the facts upon which they were said to be founded. But, if the court should go farther, and undertake to tell the jury which, in the particular instance, might be the best evidence, or compare one with the other, telling them which they should give the most force to, the court would go beyond its right. It is the jury who must judge of the force and effect of evidence themselves, and it would have been improper for the judge to have given that specific instruction.

A ground of error over which we have spent considerable time has been a claim that, as matter of fact, the verdict of the jury in this case was so manifestly against the weight of evidence, that it was the duty of a reviewing court to set it aside. There were introduced before the court and jury quite a number of signatures of Martha McDonald which were admitted to be genuine, and those signatures were not made a part of the bill of exceptions, but only copies. In the old English law, it was the rule that signatures, even if they were admitted to be genuine, or if proved to be genuine, were not admissible to the jury or to the court for the purpose of comparison, unless it happened that they were already attached to some document which was testimony in the case. A rather absurd notion to say, if it was proper at all to examine signatures for the purpose of comparison, that those signatures might not be examined which were admitted for that purpose to be genuine, although they might be upon documents not otherwise pertinent in the case. But that rule has been, as it ought to be, thoroughly overruled in Ohio, and the leading case upon the subject is Calkins v. State, 14 O. S., 222, where the rule was discussed at considerable length, and the history of it in England. The reasons for it there were quite different; juries there were more igno-

rant when the rule was established than they are supposed to be in Ohio. And the rule was laid down in this state, as in most of the states, that signatures admitted to be genuine are admissible for the purpose of comparison, and, as expressly stated in 14 O. S., are to be submitted to the jury to be compared by the jury. That case is followed by three cases, Bragg v. Colwell, 19 O. S., 407; Koons v. State, 36 O. S., 195, and Pavey v. Pavey, 30 O. S., 600, and the rule is laid down in the 19 O. S. and Pavey v. Pavey, 30 O. S., 600, that all the evidence which is submitted to the jury must be submitted to the reviewing court if the reviewing court undertake to reverse the case on the ground that the verdict is contrary to the weight of the evidence. The case in 30 O.S., is expressly strong in showing that the reviewing court must be placed in precisely the same condition as the jury in the case below. Although these papers were not made part of the bill of exceptions, as they should have been, they have been submitted to us by the state and counsel for plaintiffs in error, and we have been substantially asked to review the case upon the question whether or not the verdict was contrary to the weight of evidence. And we have examined these signatures and the testimony as fully as we could, in order to say whether or not we could, supposing that those papers were part of the bill of exceptions, reverse this case on the ground that the verdict was contrary to the weight of the evidence. It is said, and said with what seemed to us at certain stages of this case to be a good deal of force, that here was a paper which was testified to by four persons whose character was not otherwise impeached than as it is impeached in this case; that these witnesses were direct witnesses; and it is said that the testimony against them is circumstantial. That is substantially true. The comparative value of testimony, direct or circumstantial, depends very much upon what it is in the particular case. A crime can hardly ever be proved other than by circumstantial testimony, because it is rare that a crime is actually committed in sight of somebody who testifies directly that they saw such a person commit a crime. After all, evidence comes down to the probabilities of whether statements made are true, or to the existence of facts. It is a fact that persons sometimes testify to that which is untrue; and there may be such a collection of circumstances, one way or the other, as may prove so there can be no doubt that the testimony of a direct witness or indirect witness is false. Yet it is sometimes much more improbable that there should be such a collection of circumstances about a case all pointing to one direction, than that in this poor world of ours persons have testified to that which is untrue; because the fact that they do testify to that which is untrue is a matter of fact and experience. And we have to consider the truth of evidence in that way as well as others. In a large share of the cases that are tried, there is a conflict of testimony in which it is necessary to consider which of two witnesses who testify differently is correct. This subject is discussed in that old familiar work, Greenleaf on Evidence (p. 13); "Perhaps strong circumstantial evidence in cases of crimes committed for the most part in secret, is the most satisfactory of any from which to draw the conclusion of guilt; for men may be seduced to perjury by many base motives, to which the secret nature of the offense may sometimes afford a temptation. But it can scarcely happen that many circumstances, especially if they be such over which the accuser could have no control, forming altogether the links of a transaction, should all unfortunately concur to fix the presumption of guilt on an individual, and yet such a conclusion be erroneous." And there is some other language close by, that weighs upon some of the requests that are made to charge: "Nor is it necessary that each and every circumstance should be proved beyond a reasonable doubt. Some facts may be proved with more, some with less assurance of certainty. Such is the invariable result. Some facts are proved more satisfactorily than others. It is enough that you give to each fact its just and true weight. Then, after weighing and examining each and all the facts, exculpative and inculpative, if you are satisfied beyond a reasonable doubt of the guilt of the prisoner, it will be your bounden duty to say so, though

some of the alleged facts may be proved with a less degree of certainty than others."

There probably have been very few papers where there were a larger number of attempted recitals of fact and reasons for their existence, than are given in this paper. And each of those recitals, if untrue, bears upon the question of whether or not this will was probably the will of this woman. She says in the outset, that her two brothers and her son urged her to make this will—the first will of December 15—until she was bewildered and crazed. The testimony was very clear about the making of that will—that it was made at her suggestion; that she was calm, and that the state of her mind was not such and that the importunity had not been such, as it is recited to be in this will. It is elsewhere recited in the will of the 23d that the will of the 15th was witnessed by her two brothers. She expressly requested that other people should be sent for—there can be no doubt of it, nor that she was disappointed when one of those selected by her could not be a witness to that will of the 15th, and that she secured another outside party, but neither of the brothers were witnesses to that will. Her mind is not pretended to be other than clear on the 15th, and if the testimony of Mrs. Breck is to be believed it was clear on the 23d; and it is very improbable indeed that she should have so forgotten the transaction of the will of the 15th. She recites that she regards Mrs. Breck as her only true friend. That is quite contrary to some expressions, and quite severe expressions which were introduced in evidence in regard to her feelings towards Mrs. Breck, which I have sufficiently mentioned before. She recites that she had made an agreement to give Mrs. Breck her property, and that Mrs. Breck had agreed to take care of her all her life. That lets in a considerable mass of testimony in regard to whether Mrs. Breck did or did not take care of her, and the matters between the two. And in this connection the plaintiffs in error introduced an alleged contract, dated October 20, 1885, which reads:

"For services rendered, I, Martha Hall McDonald, promise to pay bearer $8,000, or whatever my property may be worth at the time of my death. This contract becomes due at my death, and the provisions of it must not be told until after my death.

(Signed), MARTHA HALL McDONALD."

That and the will are the only papers before us that are signed in that manner; and both that and the will are claimed to be forged. If that was not a genuine contract, not only was the recital in the will disproved, but the attempt to sustain the will of the 23d of December by a forged contract (if that is a forged contract) was of itself most damaging evidence to Mr. and Mrs. Breck. It is to be remembered that by the testimony of Mr. and Mrs. Breck, they were both present in the presence of Mrs. McDonald on the 23d of December, 1886, when this will was executed, and that they actually saw her execute it; so that there can be no question if there is a false will, that they are the parties who are responsible for it. It is admitted that the will itself was in the handwriting of Mrs. Breck, the attestation in that of Mr. Breck, and that they were both there. Now, they could not possibly have been mistaken in regard to whether or not that was a genuine will; so that if this was not a genuine will it must have been their production, and it takes out of the case quite an investigation in regard to who committed this crime, if there was a crime committed, leaving practically the only question to be investigated, whether or not this was a genuine will of Mrs. McDonald. If it was not the genuine will of Mrs. McDonald, after the testimony and the admissions, it follows directly that Mr. and Mrs. Breck are guilty of the forgery. This will of the 23d of December goes on to recite next, that Mrs. Breck kept that contract to Mrs. McDonald's full satisfaction. Of course, any testimony that Mrs. McDonald was dissatisfied with Mrs. Breck would tend to show that the recital was not correct. There was no reason, she says, why she should care for her relations, none of whom she had seen for thirty-three years. Now, commencing on the 22d of November,

1886, I have read the letter written by Mr. Stevenson, wherein she seemed to be very solicitous that her son Joseph should come here, and she said that if he would come, she would leave him all her property. She inquired very carefully about her other relations, and on the 7th of December, 1886, eight days before the one will, and thirteen days before the other will, Mrs. Breck herself wrote to those relations down there urging them to come, and expressing, not so strongly as it was expressed on the 22d of November, but with some degree of strength, her feelings of kindness and affection for her relations. All these expressions of kindness for her relations, and in fact the will of December 15th, 1886, by its provisions, is a declaration that the recitals in this alleged will are not true—a most solemn declaration that they are not true. There is what is known as the "carpet letter." Mr. and Mrs. Breck proved this will at once, and went into possession of the premises, and subsequently took up a carpet, and it is said that under that carpet was found an unsigned letter which is claimed to be in the handwriting of Mrs. McDonald, and which, if it was a genuine letter, would tend to support by its declarations the claims made by Mrs. Breck, including, in the language used in regard to Joseph, that Joseph was the result of incestuous connection between her brother William and herself. These papers were submitted to experts, and the majority of the experts testified that these papers were not genuine. We have, as did the jury before us, examined these papers ourselves, and must say that they do not appear to us to be genuine—neither the contract, nor the alleged will of the 23d of December, nor what is known as the carpet letter. They do not any one of them look to us as if they were the genuine writing of Mrs. McDonald. The contract and this will of December 23, 1886, are both of them signed "Martha Hall McDonald," the only solitary instances in all the papers that are produced before where there is such a signature. There is quite a remarkable blunder in this will. It is proved, if we are to believe the testimony of Mr. and Mrs. Breck, that Martha Hall McDonald signed this paper, and that after she signed it, she added, looking it over and seeing that the will was not dated, she added the date, the 23rd of December, 1886. The will was dated before that twice; and it is remarkable (if it was true that she added that date), that she made the very unusual mistake—instead of saying "23rd" she put a "th" after the "23," and the same identical mistake is made in that part of the will which is confessed to have been written by Mrs. Breck. There are other things that are inconsistent in this signature—the very beginning, the making of that "M;" these are the only two instances in which Mrs. McDonald made a signature which had only two tops to the "M." Always she made a cursive "M" when she made a large "M." These are the only two instances out of all the signatures where an "M" was made this way. And there are many other matters in the writing. I have no time or disposition to go into a full statement of all these facts—which bear upon the question of the genuineness of the will unfavorably to the plaintiff in error. It is a case where there is direct testimony that this is a genuine will; and it seems to us, a case where every circumstance aside from that, in all this trial of thirty days—it seems to us as if substantially all the circumstances of the case, including the handwriting, tend to show that this was not the genuine will of Mrs. McDonald. Now, the rules upon which we are required to act in such a case as this are very well established: The jury should have been convinced beyond a reasonable doubt of the guilt of Mr. and Mrs. Breck. The bare thought on our part that they might have made a mistake is not sufficient; we must be clearly convinced that they made an error. And we feel that, under all the evidence in the case, however much inclined the court might be to set these unfortunate parties free, we are obliged to say that we cannot under these rules set aside this verdict, and the judgment of the court of common pleas is affirmed.

N. A. Gilbert, A. T. Hills, V. P. Kline, M. B. Gary, and Arnold Green, for plaintiffs in error.

Alexander Hadden, Pros. Att'y, C. W. Collister and S. M. Eddy, for the State.